[No. G017604. Fourth Dist., Div. Three. June 29, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
ORANGE COUNTY CHARITABLE SERVICES et al., Defendants and
Appellants.

**COUNSEL**

Perlman & Perlman, Pauline Rosen and Robert C. Moest for Defendants and Appellants Orange County Charitable Services, Mitchell Gold, Herbert Gold and Cindy Seide.

Michael H. Artan; Copilevitz & Canter, Errol Copilevitz and William E. Raney for Defendant and Appellant Jonathan P. Cohen.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Roderick E. Walston, Chief Assistant Attorney General, Carole R. Kornblum, Assistant Attorney General, Peter K. Shack and H. Chester Horn, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SONENSHINE, J.*—**The state has a profound interest in protecting the public against the predatory practices of charitable solicitors which are the hallmark of this case. Nearly 30 years ago, the Legislature took note of the "fraud, deceit and imposition [worked] upon the people of the state" by such solicitors, observing that in many instances "where funds are solicited . . . for charitable purposes, [only] an insignificant amount, if any, of the money solicited and collected actually is received by any charity." (Bus. & Prof. Code, § 17510, subd. (a).) Finding then existing remedies inadequate, the Legislature declared its purpose in enacting new laws to "promote legitimate solicitations . . . for charitable purposes and restrict harmful solicitation methods, thus the people of this state will not be misled into giving solicitors a substantial amount of money which may not in fact be used for charitable purposes." (Bus. & Prof. Code, § 17510, subd. (b).)

Here, the Attorney General sought to vindicate that declared public interest by filing the underlying lawsuit, naming more than 130 individual and business entities engaged in commercial fundraising and related charitable organizations. The state alleged various improprieties in the soliciting, accounting and reporting practices of the appellants, their multitudinous subcontractors, and three charity defendants who were their primary clients. Causes of action included conspiracy to defraud, unfair competition, false advertising and breach of fiduciary duty. The complaint also alleged negligent mismanagement of charitable assets and sought involuntary dissolution. The state prayed for an accounting, injunctive relief, civil penalties and costs.

Appellants, with one exception, steadfastly refused to respond to discovery requests throughout the proceedings, contending their respective rights against self-incrimination were at stake. In the pretrial period, the court

---

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution. At the time this matter was heard, Justice Soneshine had not retired.

issued a preliminary injunction restraining certain appellants from soliciting funds in California until they made an accounting of their prior fundraising activities to the Attorney General and the court. Appellants noticed an appeal from the injunction, but we dismissed it under California Rules of Court, rule 17(a) when they failed to file briefs. Subsequently, the trial court twice held appellants in contempt for their defiance of the injunction.

All but a handful of appellants' subcontractors settled or were dismissed along the way. At the bench trial, the court heard the testimony of 26 witnesses and admitted more than 200 exhibits into evidence. In its final judgment, as more fully described *post*, it enjoined the appellants from engaging in the business of soliciting funds for charitable purposes until they had made a complete accounting of nearly $15 million in funds raised from the public through telephone solicitations on behalf of the three charity entities and various related organizations, programs and names under which they were doing business (dba's). The court further enjoined them from making false or misleading statements in their solicitations and directed them to make specific, statutorily mandated affirmative disclosures. It imposed a constructive charitable trust on the funds and found a proper basis for requiring appellants to pay civil penalties and the Attorney General's costs, in amounts to be determined after the final accounting.

The appellants, Mitchell Gold, dba Orange County Charitable Services, Herbert Gold, dba H. Gold Enterprises, Cindy Seide, dba C. S. Charitable Services, and Jonathan P. Cohen challenge the court's factual findings as unsupported by sufficient evidence and its legal conclusions as erroneous. Attacking the 45-page statement of decision and impugning the court's impartiality, the appellants contend justice mandates remand for reassessment of the record because the trial court "simply signed off on all of the government's proposed findings without independently verifying whether they could possibly be true."[1] They further assert the court exceeded its authority and violated their constitutional right to free speech in the scope and nature of certain aspects of the judgment. Finally, they contend the order imposing civil penalties and costs is without the requisite factual foundation.

After reviewing the more than 2,000-page record, we conclude appellants have no shame. In their briefs, they have shamelessly distorted the factual

---

[1]This assertion is belied by the record. Code of Civil Procedure section 632 requires a trial court, upon request, to "issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial." When the appellants requested a statement of decision, the trial court directed the state to prepare a proposed statement and judgment. (Cal. Rules of Court, rule 232; *Whittington* v. *McKinney* (1991) 234 Cal.App.3d 123, 129, fn. 5 [285 Cal.Rptr. 586].) Appellants submitted objections upon which the court entertained extensive oral argument. In adopting the proposed statement of decision, the court made substantial modifications to the final judgment. The record clearly indicates a deliberative process rather than rote adoption of respondent's position.

record, obfuscated the pivotal issues and misconstrued the law. Finding their challenges are uniformly and patently without merit, we affirm.

## FACTUAL BACKGROUND

Our summary is based for the most part on the stipulation of facts for trial and the statement of decision, which we find faithful to the record and highly reliable. We note appellants' dispute with some of the facts in our legal discussion, *post*.

### *Establishment and Structuring of the Fundraising Network*

Orange County Charitable Services (OCCS) is a sole proprietorship established by Mitchell Gold (Gold) in 1987. It is in the business of raising funds for charities through telephone solicitations for contributions from members of the public. Gold chose the company name to give donors the impression the caller was volunteering for a charity rather than working for a commercial fundraiser.

Gold realized he could increase OCCS's profitability if he did not have to submit annual bids to raise funds for his charity clients. To that end, he and Stan Windhorn, his partner in a check-cashing business, agreed to create charities which would contract their fundraising with OCCS. Windhorn incorporated Californians for Veterans, later renamed American Veterans Assistance Corporation (AVAC) and Californians Against Drugs, later renamed United Citizens Against Drugs (UCAD). He then hired OCCS to raise funds for both charities. AVAC and UCAD agreed to pay OCCS 92 percent and 93 percent, respectively, of the gross revenues secured by the fundraiser. Later, OCCS received an exclusive contract to raise funds for a fee of 90 percent of the gross revenues it obtained for another charitable organization, Stop The Pain (STP), incorporated at Gold's request by Michael Tulisiak, a former OCCS telemarketer and general manager.

Gold controlled the finances and, to a significant degree, the operations of AVAC, UCAD and STP from their inception dates.[2] The charities were incorporated as California public benefit corporations. Each article of incorporation contained substantially the following clause: "This corporation is a

---

[2]Gold hired and fired the charities' executive directors, controlled the bank accounts, and used the charities, at will, for his own purposes, even when the executive directors disagreed with his decisions. As will be further detailed in this factual summary, he used the charities' names and cashed the donation checks using their bank accounts; when he was told by one executive director to cease all fundraising on behalf of that charity, he simply instructed another charity to use dba's and open bank accounts in the name of the recalcitrant organization. The unauthorized fundraising continued; none of the funds so raised by OCCS went to the actual charities in whose name they had been solicited.

nonprofit public benefit corporation and is not organized for the private gain of any person. This corporation is organized and operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. The property of this corporation is irrevocably dedicated to charitable purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member or to the benefit of any private person." (See Corp. Code, § 5130.)

In the years 1990 through 1994, OCCS was registered as a commercial fundraiser, as required under California's Uniform Supervision of Trustees for Charitable Purposes Act (the Uniform Act), Government Code section 12580 et seq.[3] In 1992, OCCS's fundraising endeavors for AVAC, UCAD and STP were taken over by Gold's newly formed Nevada corporation, North American Funding Corporation (NAFC), of which Gold was the sole shareholder and only officer. NAFC was registered with the California Secretary of State to do business in California as a foreign corporation, dba Am-Vets Auto which, by contract with AVAC, solicited donations of automobiles from the public for resale to raise funds for AVAC. NAFC neither registered as a commercial fundraiser nor filed the required annual financial report with the Secretary of State. Nonetheless, the AVAC, UCAD and STP agreements with OCCS remained in force after NAFC took over the fundraising business.

OCCS entered into more than 100 subcontracts with various parties, including a few of Gold's relatives, pertaining to commercial fundraising for AVAC, UCAD and STP and other charities. Under the customary subcontract, 10 percent or less of the gross revenues would be paid to the charitable organizations. The subcontractor and OCCS (later NAFC) divided the 90 percent fee, according to the terms of the agreement. Gold's father, Herbert Gold, formed H. Gold Enterprises as an OCCS subcontractor. He also participated in Am-Vets Auto. He raised more than $200,000 for AVAC, UCAD and STP in 1992 and 1993, but filed no reports. Gold's sister, Cindy Seide, dba C. S. Charitable Services, obtained fundraising and public awareness contracts with AVAC, UCAD and STP. She received an 80 percent commission of the gross revenues she generated. AVAC, whose executive director is Gold's brother-in-law, Larry Silveira, paid her fundraising fees of more than $180,000 in 1992 and 1993, but she did not file reports or register C. S. Charitable Services as a commercial fundraiser.

Jonathan. P. Cohen, an OCCS telemarketer and night manager, formed California Marketing, a commercial fundraiser for AVAC, UCAD and STP.

---

[3] All further statutory references are to the Government Code unless otherwise stated.

Section 12580, as amended effective January 1, 1999, provides, "This article may be cited as the Supervision of Trustees and Fundraisers for Charitable Purposes Act." (Italics added.)

During the second year of operations, he did not file the required annual report with the Secretary of State. In 1991, Cohen became OCCS's regional manager responsible for all of its and later NAFC's telemarketing offices. He also participated in Am-Vets Auto. In 1993, he organized a second fundraising company, West Coast Marketing, which entered into agreements with and raised funds for AVAC and UCAD.

### Fundraising Practices

OCCS operated telemarketing rooms—"boiler rooms"—throughout the state. Gold instructed the boiler room managers to have telemarketers inform the donors that 75 to 80 percent of the money being raised was used for "program services." OCCS gave similar instructions to its subcontractors. Telemarketers identified themselves as "from the charity." They maintained donor lists or "tap sheets," used by OCCS and its subcontractors to solicit donations for AVAC, UCAD and STP. After donors agreed to contribute, the moneys were collected by the fundraiser and deposited into the respective charitable organization's bank account.

Under Cohen's management, OCCS and NAFC developed a practice of using multiple special program pitches[4] and multiple dba's in their solicitations. This technique kept donors from knowing they were being called repeatedly by the same organization. Mark Lyman, a driver who picked up donors' checks for South Bay Charitable Services, one of the subcontractor fundraisers in OCCS's network, testified it was common for telemarketers in the Redondo Beach office to call the same donor as many as five times in one day, using different dba's to solicit donations for AVAC, UCAD or STP. The telemarketers never disclosed they were calling from a commercial fundraising firm.

Gold, OCCS, NAFC, Herbert Gold, H. Gold Enterprises, Cindy Seide and C. S. Charitable Services raised money for AVAC's, UCAD's and STP's special charitable funds under the following names: Veterans Wish Foundation; Ed McMahon's Veterans Shelter; Veterans Food Basket Program; Veterans Blanket Program; Innocent Addicts Relief Fund; Project Cuddle; Operation Teddy Bear; and Operation Cuddle. Cohen, under his two dba's, raised funds for four of those special projects. In addition, OCCS and NAFC solicited donations for the National Police Rodeo Association (NPRA), without NPRA's knowledge or authorization, and for We Tip, Inc., and the

---

[4]In one special pitch, used hundreds of times for the Veterans Wish Foundation, the telemarketer would tell the donor about "a veteran who's dying and his daughter hadn't seen him in 20 years, and they needed to get her out there . . . to see her dad for the last time, and it had to be the next day." The scenario was purely historical anecdote, based on a single incident: It had nothing to do with any existing purpose for which funds were being raised.

California Narcotics Officers Association (CNOA). All of these funds were impressed with restricted charitable trusts limited to the purposes for which the funds were solicited from the donors. (Bus. & Prof. Code, § 17510.8.)[5] Moreover, as the experts testified, receipt of restricted funds requires maintenance of separate accounting records for those funds. The amount raised for AVAC's special programs alone totaled $2,225,000 in a three-year period. The defendants did not separately account for the revenues solicited for special programs.

In October 1991, Jim Bakich, then OCCS's general manager, believing "gross misrepresentations were being ignored, condoned and even encouraged by some owners and managers," called the matter to the attention of his business colleagues and associates and accused them of criminal misconduct. Part of the problem was appellants' use of misleading solicitation "scripts." In its statement of decision, the court alluded to appellants' practices in that regard. For example, the script for the Innocent Addicts Relief Fund advised donors, "[W]e're the group that recently donated about 20 tons of food to hospitals and agencies that care for these kids. Several of these agencies are right here in _____ county." The court found there had been a food donation only once, in Orange County. The script falsely suggested the program was ongoing and occurring in the donor's county as well. Another script represented UCAD as "an organization of concerned parents, business men [and] women here in _____ county." It stated the charity had a four-point program including, inter alia, a reward hot line and distribution of antidrug coloring and comic books through the school system. In fact, found the court, UCAD was not an organization as described in any county, "never operated a reward hotline of any kind, never paid a reward to anyone, and never published or distributed a comic book." Another script solicited donations for the "first annual UCAD drug abuse prevention festival" to be held at Knott's Berry Farm on April 10, 1992. It stated, "Approximately 80 [percent] of all proceeds go directly to Program Services." The court found the statement "demonstrably false" in both respects: No event was ever planned or scheduled at Knott's Berry Farm and the defendants knew they were receiving more than 90 percent of the proceeds to cover the cost of fundraising. Additional examples abound. In a scripted solicitation for STP, the caller said, "I'm calling for Project Cuddle. We are the folks

[5]Business and Professions Code section 17510.8 provides, "Notwithstanding any other provision of this article, there exists a fiduciary relationship between a charity or any person soliciting on behalf of a charity, and the person from whom a charitable contribution is being solicited. The acceptance of charitable contributions by a charity or any person soliciting on behalf of a charity establishes a charitable trust and a duty on the part of the charity and the person soliciting on behalf of the charity to use those charitable contributions for the declared charitable purposes for which they are sought. This section is declarative of existing trust law principles."

who donate stuffed animals." Other scripts falsely suggested STP had four levels of participation for donors, described as platinum, gold, silver and bronze. STP had no such programs, and its executive director did not authorize use of the scripts.

The testimony of several donor witnesses was uncontradicted regarding misrepresentations. Simon Langer recounted four telephone solicitations between October 1992 and May 1993 in which the telemarketers all identified themselves as being *from* the charities UCAD, Operation Teddy, AVAC or the Veterans Wish Foundation. He had received hundreds of such calls over a two-year period. No one ever disclosed his or her commercial fundraising status. Langer was never told Veterans Wish Foundation was a dba of AVAC or Operation Teddy Bear was a dba of STP. Nor was he informed about the percentage of funds that would be used to pay for the fundraising.

Moira Nelson testified about solicitation calls she received on consecutive days in September 1993. The first caller said he was "from the American Veterans Assistance Corporation" and was "trying to get some money together to open a new home for homeless veterans in Redondo Beach." In actuality, AVAC did not do telemarketing; only OCCS (and NAFC) and OCCS's subcontractors did so. And there was no evidence AVAC ever had a plan to open a homeless shelter for veterans in Redondo Beach.

Nelson said the second caller identified himself as either a sergeant or captain for "the California Firefighters." He said he was trying to raise funds to send disadvantaged children to a show. When Nelson asked for the federal tax identification number of the California Firefighters, she was given the same number as that given to her for AVAC's purported homeless veterans project. She did not know it at the time, but the tax identification number actually belonged to OCCS.

Marianne Canepa was called in December 1991 by a person identifying himself as a police officer volunteering his time to obtain donations for the National Police Rodeo Association to send underprivileged children to a rodeo. In fact, the caller was soliciting funds for UCAD, using the NPRA name without its knowledge or authorization. Canepa made out a check to NPRA, but someone else wrote "UCAD" on the payee line and deposited the check into UCAD's bank account. If Canepa had been told the true nature of the call, she would not have contributed: She gave because she believed the police officer was going to do something nice "for the kids." She received another call about two months later from a person "from [NPRA]" soliciting funds on its behalf. She gave again, making out the check to NPRA, only to

find someone had added UCAD on the payee line and deposited the check to UCAD's account. In February 1993, Canepa received a call from UCAD and made a donation. She would not have given if she had known a commercial enterprise was involved or that 90 percent of her donation would not be used for charitable purposes.

A number of other donors testified to the same effect, generally stating they did not know of the relationships among the various organizations and projects, the involvement of the commercial fundraiser, or the disproportionate allocation of the donated funds. One witness, Gregory Woodruff, said the person who called him always identified himself as a "volunteer." If the caller had said he was a commercial fundraiser, Woodruff would have made further inquiries regarding the amount of money going to the charity. And Emma Halibrand, a retired widow, said she would not have made a number of donations had she known of the interrelatedness of the entities because "that would have been giving a donation twice as far as I'm concerned." She added, "I'm one of these [people], you know, that really believe what they tell me."

In total, OCCS, NAFC and the subcontractors raised nearly $15 million on behalf of AVAC, UCAD and STP. The average donor gave $35, leading the court to observe that about 400,000 donors were subjected to the fraudulent solicitation practices.

### Accounting and Reporting Issues

Public benefit corporations must file annual reports containing specific forms and information with the Attorney General. (§ 12586.) UCAD's reports for 1989 through 1992 contained discrepancies, inaccuracies and questionable reporting techniques attributable to efforts directed by Gold and the charities' outside accountant, Brian Brown, who acknowledged "stretch-[ing]" the rules of the "game." Fundraising expenses were allocated to program services, contrary to generally accepted accounting principles (GAAP) and the guidelines of the American Institute of Certified Public Accountants (AICPA) regarding financial reports of nonprofit organizations.[6] Defendants' own expert admitted as much. The effect of the unacceptable accounting methods was to overstate the program services performed by the charities and correspondingly understate the expenses of fundraising.

---

[6] AICPA is one of the principal governing organizations of the accountancy industry, and it plays an important role in determining what constitutes GAAP. Business and Professions Code section 17510.5 requires soliciting organizations to maintain financial records in accordance with GAAP, as defined by AICPA and the Financial Accounting Standards Board. Inter alia, AICPA promulgates statements of position, known as S.O.P.'s, one of which loomed large in the proceedings. S.O.P. 87-2 is the guideline describing the conditions under

The same type of inaccurate transpositions pervaded AVAC's 1990 and 1991 reports. As a matter of fact, the court expressly found AVAC filed its "last accurate report of the charities' Program Service expenditures" in documents reflecting the fiscal year ending 1989. The reports for each of the years thereafter contained more than $1 million in discrepancies between the program service claims and the actual expenditures on charitable programs. UCAD's reporting was to the same effect.

Gold and Brown also designed a plan for making misleading reports of in-kind contributions. This technique enabled the charities to artificially increase UCAD's program-service-expense-to-total-revenue ratio to qualify for participation in the federal government's annual employee charity payroll deduction program. It also lent credibility to the solicitors' misleading representation that large percentages of the donations were being used for program services. For example, UCAD reported it received used books valued one year at $322,000 and another year at $848,343, and distributed books in the same value amount for the respective years. This achieved an artificial program-service-expense-to-total-revenue ratio of 100 percent. What actually transpired was nothing more than a paper transfer of title to a truckload of outdated and essentially worthless used textbooks from one charity to another so each could inflate its ratio. Windhorn admitted participating in the practice, in violation of GAAP standards. The trial court concluded the reports were misleading, as were any solicitation representations based upon them.

NPRA never authorized OCCS or its subcontractors to solicit funds and never received funds from OCCS or NAFC or any of the subcontractors. Nonetheless, OCCS and NAFC *raised* funds for NPRA in 1991 and 1992, but did not file a financial report accounting for those funds as required by statute. To this day, OCCS/NAFC has not accounted to the Attorney General for funds raised in the name of NPRA. Moreover, OCCS/NAFC raised funds for We Tip, Inc., during 1991 and 1992, but did not file an accounting for those funds, or for the several thousand dollars raised after We Tip, Inc. terminated their contract.

During the course of this litigation, AVAC's executive director, Silveira, severed AVAC's relations with the defendants and prepared an accounting to determine whether AVAC had been paid all of the funds to which it was entitled during 1992 and 1993. He found a $90,000 underpayment to AVAC and a like overpayment to OCCS. Neither Gold nor OCCS has ever accounted for the funds. Additionally, without authorization, OCCS used a

which nonprofit organizations may, in their financial reports, allocate fundraising expenses to several accounting categories consistent with GAAP.

rubber stamp of Silveira's signature to negotiate checks totaling about $200,000. Silveira did not know AVAC had been receiving funds because Gold repeatedly told him no solicitors were raising money on AVAC's behalf. Although in October 1993, more than $150,000 was deposited into the AVAC account, AVAC was paid only $3,000 for that period. The court found OCCS took AVAC's money and used it for its own purposes in violation of its fiduciary duties.

UCAD's executive director, Michael Lord, also terminated OCCS/NAFC as the charity's principal fundraiser. Gold then refused to turn over donor checks payable to UCAD unless Lord agreed to remit 80 percent of the funds to Gold. According to Lord's calculations, UCAD was owed more than $30,000. OCCS has never accounted for the funds to either UCAD or the Attorney General.

When the state filed the underlying lawsuit, STP's executive director, Darcy Girton, instructed Gold and the other defendants and fundraisers to cease all activity on behalf of STP immediately. She also told Gold not to cash any checks in STP's name after a certain date. Gold, however, drew three checks totaling $9,000 on STP's deposit account, making them out to C. S. Charitable Services, Herbert Gold, and OCCS. The three checks were negotiated through the STP account. Gold also instructed Lord to record dba's for UCAD in the name of "Stop The Pain" and "Operation Teddy Bear" and to open a bank account using those names. The accounts were, in fact, opened and funds deposited and disbursed in the amount of $27,000, with nothing paid to STP.

OCCS, NAFC and Herbert Gold filed no statutory financial reports of their fundraising for charitable purposes for the calendar year 1993. Neither NAFC nor Seide registered with the Attorney General. Seide never filed any financial reports with the state, although she had contracts with all three charities, and AVAC alone paid her nearly $200,000 in fundraising fees. All of the defendants received fees from AVAC or UCAD.

OCCS registered as a commercial fundraiser in California for each of the years 1990 through 1993. The 1990 reports, all signed by Gold's wife, Patricia Gold, did not mention OCCS's fundraising activities: Instead, they reported figures copied from the annual federal informational tax returns (Form 990's) of AVAC, UCAD and STP. Reports for subsequent years either were copied from the charities' Form 990's or set forth figures which were utterly irreconcilable with the charities' own reporting. For instance, while OCCS reported it raised only $242,640 for UCAD in 1991, UCAD reported it received more than $400,000 from OCCS/NAFC that same year.

Cohen registered as a commercial fundraiser in California for 1990 and 1991, but filed inaccurate reports of his fundraising under California Marketing in 1990, and failed to file any reports in 1991. He ignored two demands from the Attorney General that he do so, and at trial offered no explanation for this failure. He admitted for purposes of trial that, under his corporate entities, he raised funds for the defendant charities using a variety of special programs.

The facts recited above do not tell the whole story, but fairly portray the substance of the evidence upon which the trial court based its statement of decision and judgment, as outlined below. Further facts will be discussed only as relevant to the legal analysis section of this opinion.

### Statement of Decision and Judgment

In its statement of decision, the court found, inter alia:

The defendants conducted their business unlawfully, Gold founding the charities for profit from fundraising activities;

The defendants raised money for restricted charitable purposes. The funds were impressed with a restricted charitable trust, but defendants failed to keep separate accounts of the funds, did not use them for the specified purposes, and, in fact, used them for other purposes;[7]

Gold and OCCS engaged in unauthorized fundraising for several charities which never received any of the funds. This conduct constituted disregard of fiduciary duties and statutory law;

Gold controlled virtually every aspect of the operations and finances of all three charities. He and OCCS misled the public with multiple pitches for the purpose of facilitating repeated solicitations from the same donors without the donors' knowledge. The scripts' claims about the nature, mission and

---

[7]As noted at footnote 6, *ante,* charitable fundraisers must maintain their records in accordance with "generally accepted accounting principles [GAAP] as defined by the American Institute of Certified Public Accountants and the Financial Accounting Standards Board." (Bus. & Prof. Code, § 17510.5.) Defendants' own accounting expert testified GAAP requires that funds solicited for special purposes be accounted for separately from funds raised for general charitable purposes. He stated, "[T]he organization has a fiduciary responsibility to spend restricted funds in the manner in which the funds were provided to the organization."

In addition, as noted in footnote 5, *ante,* under Business and Professions Code section 17510.8, when the fundraiser solicits money for a declared purpose, the donation must be used for that purpose and not for the general fund operations of a charity. Virtually all of the money raised for the special programs was spent on fundraising fees or as "public-awareness fees," but not for the special purposes identified by the telemarketers.

activities of the charities were false and misleading. Gold instructed the telemarketers to inform the public that 75 to 80 percent of the funds raised would go toward program services. OCCS gave similar instructions to subcontractors. Additionally, the very name of OCCS evidenced Gold's intent to defraud the public. An integral part of the business was widespread deception to obtain donations that otherwise would not have been given. All misrepresentations were made with the full knowledge of Gold and OCCS;

OCCS raised funds on behalf of NPRA without any contractual agreement to do so and without accounting for the funds raised. OCCS underpaid AVAC and overpaid itself by some $90,000 in 1992 and 1993. It negotiated $50,000 in unauthorized checks drawn on AVAC's bank account. It wrongfully took $146,000 in checks during October 1993. Gold wrongfully negotiated checks from STP and refused to turn over to UCAD $3,000 in checks raised for UCAD;[8]

OCCS failed to file an accounting of fundraising activities for charities in 1993. Its inaccurate reports of activities in 1990, 1991 and 1992 contained multimillion-dollar discrepancies. All of the defendants failed, in one or more ways, to register and/or file accurate reports as required by California's laws. Gold, OCCS and NAFC were found in contempt for violating the preliminary injunction. None of the defendants have ever accurately accounted to the Attorney General for all of their fundraising activities, and Gold, OCCS, NAFC, Herbert Gold and Seide throughout the proceedings "refused . . . to account for their activities as commercial fundraisers in California";

In its eight-page judgment, the court enjoined appellants from making various false or misleading representations to prospective donors, directed them to make specified affirmative representations, barred them from soliciting for organizations which had not authorized them to do so, imposed certain reporting duties on appellants, and directed them to account for their fundraising activities in California up to the date of the judgment, including a full accounting for all funds received by them in the name of 11 different charitable programs. The court further enjoined appellants from commercial fundraising pending a complete accounting, and ordered them to register as commercial fundraisers and maintain all required bonds. It also imposed a charitable trust on moneys recovered under the accounting provisions of the

---

[8]Gold contends settlements between the charity defendants and Gold, OCCS and NAFC vitiate the court's order for an accounting. We disagree. The settlements cannot defeat the People's right to an appropriate accounting with respect to all funds. Additionally, to the extent the accounting shows Gold, OCCS and NAFC took money donated by the public for charitable purposes, the appellants were properly ordered to pay those funds into court, to be put to their intended charitable use.

judgment. It found civil penalties were authorized under various statutes, based upon eight categories of acts and practices.[9] However, the court declined to assess the penalties, reserving jurisdiction to determine the forumla to be applied upon completion of the accounting required by other parts of the judgment.[10] Finally, pursuant to statute (§ 12598, subds. (b) and (c)), it awarded the Attorney General the costs of investigating and bringing the action. But it found, without prejudice, the cost bill submitted by the state failed to justify some of the costs requested. It therefore directed the Attorney General to resubmit the cost bill after disposition of the appeal. The Attorney General advises us that, should we affirm the judgment, the state will seek an appropriate award of costs in the trial court under the authorizing statute.

LEGAL DISCUSSION

I

*Sufficiency of the Evidence*

A high hurdle must be overcome by appellants challenging the sufficiency of evidence. ■ Where the court issues a statement of decision, it need only recite ultimate facts supporting the judgment being entered. (*People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524 [206 Cal.Rptr. 164, 53 A.L.R.4th 661].) If the judgment is supported by factual findings based on substantial evidence, the reviewing court affirms. (See, e.g., *Brewer* v. *Simpson* (1960) 53 Cal.2d 567, 583 [2 Cal.Rptr. 609, 349 P.2d 289].) Conflict in the evidence is of no consequence. Our reviewing power " 'begins and ends with a determination as to whether there is *any*

---

[9]The court found the following conduct warranted civil penalites: 1) the appellants'·pattern of misleading representations and failure to make required disclosures in the course of fundraising for AVAC, UCAD and STP; 2) their failure to identify themselves as commercial fundraisers since the effective date of the statutory requirement; 3) their diverting of restricted charitable funds to purposes other than those represented to donors as the basis for the donations; 4) their misleading statements and inferences that the telemarketers were working for the charities, rather than a commercial fundraiser; 5) their receipt of donations for entities which did not authorize them to solicit, and their failure to properly account for the funds; 6) their negotiating checks on the accounts of AVAC and UCAD without authorization from the charities; 7) their failure to register and/or file required reports; and 8) their filing of inaccurate reports of their fundraising activities.

[10]There is nothing infirm about the civil penalties finding. The issue warrants only a footnote discussion. Business and Professions Code sections 17206 and 17536 authorize penalties of up to $2,500 for each separate act in violation of false advertising and unfair competition laws. Each act of false advertising constitutes a separate violation. (*People* v. *Toomey* (1984) 157 Cal.App.3d 1 [203 Cal.Rptr. 642]. Upon the finding of violations, imposition of civil penalties in *some amount* is mandatory. (*People* v. *Custom Craft Carpets Inc.* (1984) 159 Cal.App.3d 676, 686 [206 Cal.Rptr. 12].)

substantial evidence to support [the factual findings]; [we have] no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or *in the reasonable inferences that may be drawn therefrom.*' [Citation.]" (*Orange County Employees Assn.* v. *County of Orange* (1988) 205 Cal.App.3d 1289, 1293 [253 Cal.Rptr. 584], original italics.)

██ This stringent standard spells doom for appellants' contention the facts do not support the court's findings. We list only those findings challenged by Gold, coupled with our conclusions regarding supporting evidence:

1) Gold "controlled virtually all aspects of the finances and to a significant degree the operation of AVAC, UCAD and STP from the date they each were formed." This finding is supported by the above summarized testimony of Tulisiak and the executive directors of the respective charities that, inter alia, Gold controlled the hiring and firing decisions, the service programs, the bank accounts, the cash flow and the very survival of the charities.

2) Gold intentionally deceived the public for his own benefit by inaccurate and misleading solicitation, reporting and accounting techniques. The findings are well supported by uncontroverted evidence summarized, *ante,* which we need not reiterate. By way of example only, the evidence showed: accounting distortions; misrepresentation of the percentage of funds which would actually be used for the charitable purpose identified in the solicitation; multiple special pitches designed to facilitate repeated calls to the same donor without that donor's knowledge; scripted pitches reciting blatantly false sob stories; and failure to disclose the fundraiser's identity and commercial status.

3) GAAP requires a fundraiser to separately report funds raised for a restricted purpose. (See fn. 7, *ante.*) The Attorney General's expert, Frank Johnson, testified extensively about the accounting requirements of charities and commercial fundraisers for moneys raised for specific charitable purposes. He concluded if California law requires commercial fundraisers to maintain accounting records of their fundraising activities consistent with GAAP (Bus. & Prof. Code, § 17510.5), they must "keep records so as to make [the distinction between restricted and unrestricted funds]." Gold's own expert *conceded* on cross-examination that if, "by virtue of the nature of the solicitation a determination is made that the funds received are restricted, GAAP would require that separate accounting records be maintained with respect to those fundraising efforts." There was substantial evidence the solicitations resulted in receipt of funds which GAAP required to be treated as restricted charitable funds.

4) Gold raised funds for NPRA without the organization's authority. Gold, OCCS and NAFC *stipulated* to raising funds for NPRA, and the president/board member of NPRA testified no authority was given.

Gold further challenges the court's finding of liability based on violations of Business and Professions Code section 17510.85 because it relies on acts occurring before the statute's effective date, January 1, 1993. He is partly right, but his victory is empty. Business and Professions Code section 17510.85 requires commercial fundraisers to so identify themselves to prospective donors before soliciting a donation and to disclose their names as registered with the Attorney General. There is abundant evidence OCCS telemarketers did not make such disclosures, even in 1993, after the statute's effective date.[11] Moreover, the court, recognizing the difference between conduct before and after January 1, 1993, took care to ensure separation of the wheat from the chaff: It delayed imposing civil penalties until such time as the accounting is completed, so there will be a full and accurate record of the extent of the violations.

Gold also attacks the court's imposition of joint and several liability among Gold, OCCS and NAFC, arguing there are no independent findings as to the liability of each and no findings piercing the corporate veil. We have reviewed Gold's objections to the statement of decision. Because he did not raise these deficiencies in the court below, he waived the objections. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1136 [275 Cal.Rptr. 797, 800 P.2d 1227] [". . . omissions in the findings or statement of decision must be brought to the attention of the trial court to avoid the inference [in favor of the prevailing party] on appeal"].)[12]

In a separate brief, Cohen asserts the evidence failed to show he or his fundraising corporations were part of any wrongdoing: The court simply "lumped" him in with the other defendants. The assertion is belied by the record.

To wit, Cohen stipulated he managed one of the OCCS offices in the early years, during which the telemarketers were making misrepresentations to the

---

[11]Six witnesses testified OCCS and NAFC telemarketers failed to disclose solicitations were being made by professional fundraisers. In addition, there were the cynical scripted pitches which leaned over backwards to make sure the prospective donor did not know the true identity of the soliciting organization.

[12]Gold also challenges the court's finding that 20 percent is a "reasonable amount for the cost of raising" certain funds. We fail to see how the finding harms Gold. The fundraisers' own *contracts* with the charities defined the cost of fundraising to be 20 percent of the funds raised. Thus, there is no issue of the court arbitrarily or impermissibly setting a fixed percentage as reasonable. (See, e.g., extensive discussion in *Riley* v. *National Federation of Blind* (1988) 487 U.S. 781, 787-795 [108 S.Ct. 2667, 2672-2677, 101 L.Ed.2d 669].) We further note the cost of fundraising is not the equivalent of fees or commissions for fundraising.

donors. He stipulated he raised funds for restricted programs of AVAC, UCAD and STP, and the evidence showed no separate accounting books were maintained. He stipulated he was regional manager of OCCS in 1991, responsible for "supervising all of the telemarketing offices of OCCS and later NAFC," and the evidence showed during that time there were "gross misrepresentations [which] were being ignored, condoned and even encouraged by some managers and owners." He stipulated that when he supervised OCCS's boiler rooms, OCCS and NAFC raised funds for NPRA and We Tip, Inc., and the evidence showed none of this fundraising was authorized by the charities. He stipulated he formed California Marketing and West Coast Marketing, and there was evidence both enterprises raised funds for AVAC and UCAD, using special program names such as Veterans Wish Foundation, Veterans Food Basket Program, Innocent Addicts Relief Fund and Project Cuddle. All of this evidence, together with reasonable inferences, provided the court with a legitimate basis for concluding Cohen was liable along with his codefendants.

Cohen protests the court made no finding he shared an identity with his two corporations. That complaint suffers from the same fatal flaw as does Gold's alter ego issue: It is waived because Cohen did not make the required objection to the court's statement of decision. (*In re Marriage of Arceneaux, supra,* 51 Cal.3d at p. 1136.)

## II

Appellants contend the court misinterpreted California's charitable trust laws and the fiduciary responsibilities of charitable trustees and went "well beyond any statutory authority" in its judgment. The argument is embellished with a constitutionality flourish. We are not persuaded. The judgment passes muster.

### A Survey of the Applicable Law

■ Virtually every aspect of the activities of charities and their commercial fundraisers is subject to comprehensive regulation. The assets of nonprofit corporations such as AVAC, UCAD and STP, organized solely for charitable purposes, are impressed with a charitable trust which the Attorney General has a duty to protect. (*Pacific Home* v. *County of Los Angeles* (1953) 41 Cal.2d 844, 851-852 [264 P.2d 539].) A complete range of equitable remedies vindicates the public interest in charitable assets; such remedies include injunctions to prevent and correct breach of fiduciary obligations arising from a trust. (Code Civ. Proc., § 526, subd. (a)(7).)

Thirty-five years ago, our Supreme Court commented on the importance of the Uniform Act in rectifying "the problem of providing adequate supervision and enforcement of charitable trusts." (*Holt* v. *College of Osteopathic*

*Physicians & Surgeons* (1964) 61 Cal.2d 750, 754 [40 Cal.Rptr. 244, 394 P.2d 932], fn. omitted.) As it aptly noted, "Since there is usually no one willing to assume the burdens of a legal action, or who could properly represent the interests of the trust or the public, the Attorney General has been empowered to oversee charities as the representative of the public, a practice having its origin in the early common law." (*Ibid.*)

Under the Uniform Act, commercial fundraisers for charitable purposes must register with the Attorney General and file financial reports of the money they raise for charities in California and their fundraising costs. (§ 12599, subds. (b) & (c).) The statute defines " 'commercial fundraiser for charitable purposes' " as any individual, corporation, or legal entity who for compensation solicits funds in California for charitable purposes or, as a result of a solicitation, receives or controls the funds. (§ 12599, subd. (a)(1) & (2).) Commercial fundraisers are "constructive trustees" with respect to the funds they raise, and they have an affirmative, unqualified duty to report to the Attorney General. (§ 12599, subd. (g).) Section 12599, subdivision (h) requires commercial fundraisers to disclose to persons solicited, upon written or oral request, the percentage of the funds that goes to fundraising expenses. The fundraiser who fails to comply with the registration and financial reporting requirements of the statute may not solicit funds for charitable purposes, and failure to comply is grounds for "an injunction against solicitation in this state for charitable purposes and other civil remedies provided by law." (§ 12599, subd. (f).)

The Attorney General's power to oversee charities extends far beyond the Uniform Act. The charitable solicitation statutes, namely Business and Professions Code section 17510 et seq., impose added obligations on solicitors of charitable contributions in California. (Bus. & Prof. Code, §§ 17510.3 & 17510.4 [requiring certain affirmative disclosures by solicitors of donations]; Bus. & Prof. Code, § 17510.5 [requiring business records and disclosures be based on GAAP as defined by AICPA and the Financial Accounting Standards Board]; Bus. & Prof. Code, § 17510.8 [making charities and solicitors fiduciaries of the donors and establishing a charitable trust for donations accepted]; and Bus. & Prof. Code, § 17510.85 [mandating commercial fundraisers disclose to prospective donors, prior to soliciting, that they are commercial fundraisers and give their names as registered with the Attorney General].)

In addition, the false advertising laws of Business and Professions Code section 17500 et seq., prohibiting untrue or misleading statements, undoubtedly apply to representations made by fundraisers with the intent of obtaining charitable solicitations. Business and Professions Code section 17535

allows the Attorney General to seek injunctive relief against certain practices violating section 17500. The test of a cause of action is whether the advertising is such that " 'members of the public are likely to be deceived.' [Citations.] Allegations of actual deception, reasonable reliance, and damage are unnecessary." (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].)

Finally, unfair competition laws prohibit any unfair, deceptive or unlawful business or other practice violating false advertising laws. (Bus. & Prof. Code, § 17200.) The Attorney General may obtain injunctive relief and civil penalties, and the remedies are cumulative to those available under other provisions of the law. (Bus. & Prof. Code, § 17205.) The court may impose civil penalties of $2,500 for each violation of Business and Professions Code sections 17200 and 17500. (Bus. & Prof. Code, §§ 17206, 17536.)

### *The Court's Interpretation and Application of the Law*

Appellants contend the court, in general, misinterpreted and misapplied the law. At the heart of their argument is a dogged insistence that the judgment rests upon the court's erroneous conclusion regarding a fiduciary's general, common law duty of full disclosure. True, the court's statement of decision alludes to a commercial fundraisers' duty to disclose all material facts that would be likely to impact the donor's decision. But the validity of the judgment does not depend upon that finding, thus we are not concerned with and do not decide the issue in the abstract. ■ If the judgment is supported by *any* findings and justified under the law, we affirm, even if the court made the decision for the wrong reason. (See, e.g., *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 211 [223 Cal.Rptr. 645].) Under that light, the judgment is impervious to attack.

■ Paragraph I.A. of the final judgment enjoins appellants from commercial fundraising in California until they comply with the court's order to account for their prior fundraising activities. The evidence supports the appropriateness of the injunction: Herbert Gold, Cindy Seide and NAFC *stipulated* they failed to obey the law requiring them to file the reports; and OCCS and Cohen filed obviously inaccurate reports. This provision is, of course, *fundamental* to effective enforcement of the state's laws governing the activities of commercial fundraisers. Notwithstanding appellants' truncated and puzzling argument about violation of their rights under the Fifth Amendment, the Constitution does not relieve them of their statutory obligation to account for their fundraising activities in California as a condition

of doing business in this state. (§ 12599, subds. (c) & (f).)[13] In short, the court properly exercised its authority to bar appellants from carrying on fundraising activities until they comply with the law.

■ Paragraph I.B. of the final judgment enjoins appellants from engaging in the following practices in soliciting funds from donors: (1) making false or misleading statements in violation of Business and Professions Code section 17500 (defined as statements which are likely to deceive the public); (2) falsely representing to the donor that the solicitor is "a doctor, a police officer, a fire fighter, a veteran or any other false statement concerning the position or profession of the solicitor"; (3) failing to state at the beginning of each solicitation, "I am a commercial fundraiser employed by [the name of the entity registered with the Attorney General) and I am calling on behalf of [the name of the charity]" (Bus. & Prof. Code, § 17510.85); (4) "failing to disclose the percentage of total fundraising expenses of the fundraiser upon receiving a written or oral request from a person solicited for a contribution for a charitable purpose" (§ 12599, subd. (h));[14] (5) soliciting funds in the name of any organization without that organization's written authorization; (6) failing to maintain records with respect to identifying all of the particulars of funds solicited and received; and (7) failing to register as a commercial fundraiser and post bonds as required by law (§ 12580 et seq.).

Appellants argue the court went overboard in the scope of its order. But in light of the *factual* record of appellants' past fundraiser activities, "widespread" and "rampant" misstatements, overall pattern and practice of misrepresentation, and failure to comply with statutory registration, accounting, bonding and disclosure requirements, we find the reasons for the detailed list of do's and don't's self-evident.

Appellants complain they will be unable to discern what is allowed and what is prohibited under a too vague "false and misleading" standard. *Au contraire*, we find that aspect of the judgment abundantly clarified by the provisions which follow it. And it is *obvious* appellants are enjoined from continuing their practice of, for instance, falsely telling prospective donors

---

[13]Under section 12599, subdivision (f), it is "unlawful for any commercial fundraiser for charitable purposes to solicit funds in this state for charitable purposes unless the commercial fundraiser for charitable purposes has complied with the registration or annual renewal and financial reporting requirements of this article. Failure to comply with these . . . requirements shall be grounds for injunction against solicitation in this state for charitable purposes and other civil remedies provided by law."

[14]This part of the judgment sets out section 12599, subdivision (h) verbatim, including its definition of "percentage of total fundraising expenses" and the procedural rules for compliance. Thus, the disclosure requirement of the court's order rests upon a statutory directive, not, as appellants would have us believe, a common law fiduciary duty of full disclosure.

they are raising funds to rush a daughter to see her dying father one last time, or saying they are trying to get together enough money for a nonexistent shelter for homeless veterans, or making up allocation percentages which are utterly without a factual basis. The record is replete with other examples. Reviewing that record, appellants can ferret out enough information to guide them in the future as they endeavor to eliminate deception from their business practices.

■ Paragraph III of the final judgment imposes a constructive charitable trust on moneys received by appellants "in the amount of funds shown by the accounting filed by [appellants] to have been raised within the State of California for charitable purposes other than those represented to donors." Appellants complain if a constructive trust is in order, it can extend only to moneys *owed* to the charities. They say because they settled with the charities during trial, no moneys are owed, thus imposition of a constructive trust is improper. The disingenuous, hypertechnical argument completely ignores the Attorney General's entitlement to an accounting which, regardless of any agreement between appellants and the charities, will determine the true state of affairs vis-à-vis the People's interest in appellants' misuse of donated funds. Until the accounting is completed, the amount of money owed to the charities cannot be determined. Appellants hold in their own hands the key to their future as commercial fundraisers in California.

### The Issue of Constitutionality

■ Appellants challenge that portion of the court's order requiring them to disclose fundraising expense percentages to prospective donors. Relying on *Riley* v. *National Federation of Blind, supra,* 487 U.S. 781, they say the order constitutes an impermissible infringement on their right to free speech.

*Riley* is distinguishable. There, the court found unconstitutional three provisions of a North Carolina statute dealing with professional fundraising. As relevant here, the statute compelled the fundraiser, at the outset of the contact with the potential donor, to make an unrequested disclosure of "the average percentage of gross receipts actually turned over to charities by the fundraiser for all charitable solicitations conducted in North Carolina within the previous 12 months." (*Riley* v. *National Federation of Blind, supra,* 487 U.S. at p. 786 [108 S.Ct. at p. 2672].) The court found the state's "prophylactic rule of compelled speech, applicable to all professional solicitations" was "unduly burdensome [to free speech interests] and not narrowly tailored." (*Id.* at p. 798 [108 S.Ct. at 2678.) In its lengthy discussion, it noted, inter alia, the pragmatic effect of the rule requiring spontaneous disclosure of the information at the beginning of the fundraising conversation: "[I]f the

potential donor is unhappy with the disclosed percentage, the fundraiser will not likely be given a chance to explain the figure; the disclosure will be the last words spoken as the donor closes the door or hangs up the phone." (*Id.* at p. 800 [108 S.Ct. at p. 2769].)

Here, by contrast, the court's order does *not* require spontaneous disclosure of the percentage information before the solicitation. Indeed, the speaker need not give percentage information at all unless the donor *asks*. (§ 12599, subd. (h).) Therein lies the difference; we need not belabor the obvious.[15] As the *Riley* court itself notes, "[A] *donor is free to inquire how much of the contribution will be turned over to the charity. Under another North Carolina statute, also unchallenged, fundraisers must disclose this information upon request.* [Citation.] Even were that not so, if the solicitor refuses to give the requested information, the potential donor may (and probably would) refuse to donate." (*Riley* v. *National Federation of Blind, supra,* 487 U.S. at p. 799 [108 S.Ct. at p. 2679], italics added.) Requiring the commercial fundraiser to respond to a donor's question with information taken from records it is required by law to keep is not the equivalent of compelled speech and does not constitute an undue burden on free speech.

### The Award of Actual Costs

Section 12598, subdivision (b) entitles the Attorney General "to recover from defendants named in a charitable trust enforcement action all actual costs incurred in conducting that action, including the costs of auditors, consultants, and experts employed or retained to assist with the investigation, preparation, and presentation in court of the charitable trust enforcement action." Under subdivision (c), the award of costs is based upon the court's requisite finding the action "has resulted in pecuniary benefits or corrected a breach of trust for any charitable organization, or charitable purpose." However, such costs shall not "exceed one-third of the pecuniary benefit to any charitable organization or charitable purpose realized by the Attorney General's action." (§ 12698, subd. (c).)

Appellants assert, in the broadest generalities only, that there is insufficient evidence to support the pecuniary benefits finding. They ignore the

---

[15]We do not decide any issue regarding the allowable percentage a commercial fundraiser may take as a fee for soliciting funds for charities. We note, however, in 1994, the Legislature enacted Business and Professions Code section 17510.87, expressly applicable only to commercial fundraising contracts for charitable purposes "entered into or renewed on or after January 1, 1995." The statute prohibits the fundraiser "from retaining more than 50 percent of the net proceeds collected as a fee for fundraising services." However, for purposes of section 17510.87 only, "a fee does not include a flat fee agreed upon prior to the initiation of direct solicitation that is associated with the development of a solicitation or marketing campaign for charitable purposes."

"breach of trust" aspect of the statute entirely, and they offer no cogent argument. We have little doubt the Attorney General's action has at least corrected a breach of trust. Moreover, as noted at footnote 8, *ante,* the evidence of appellants' misconduct gives rise to the reasonable inference of pecuniary benefit, the exact amount of which remains to be calculated upon appellant's accounting to the Attorney General. To the extent Gold, OCCS and NAFC have retained money belonging to charities, the funds will be put to their intended purpose. Appellants are in a poor position to argue the pecuniary benefit factor was unproven: They created any uncertainty in that regard by refusing to make the accounting. For that reason, their complaint falls on deaf ears. And in any event, appellants' issue was dead on arrival for lack of a proper legal argument: Had we not reached the merits, we would have deemed the point waived. (See *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 152 [135 Cal.Rptr. 802].)

The judgment is affirmed. The Attorney General shall recover costs on appeal.

Sills, P. J., and Scoville, J.,* concurred.

A petition for a rehearing was denied July 29, 1999, and appellants' petition for review by the Supreme Court was denied September 29, 1999.

---

*Retired Presiding Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.