Filed 2/7/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CONSTELLATION-F, LLC, et al., | B293033 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. PC056984) |
| v. | |
| WORLD TRADING 23, INC., et al., | |
| Defendants and Appellants. | |
| ——————————————— | B293883 |
| CONSTELLATION-F, LLC, et al., | |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. PC056984) |
| v. | |
| WORLD TRADING 23, INC., et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Stephen P. Pfahler, Judge.  Affirmed in part, reversed in part, remanded in part with directions, and dismissed in part.

Shafron & Kammer, Shelly Jay Shafron, Kevin David Kammer, and Douglas G. Carroll for Plaintiffs, Respondents and Appellants.

No appearance for Defendants and Appellants.

_____

A commercial lease set the rent to increase if the tenant stayed past a certain date. That date came and went. The commercial tenant stayed put. Yet it would not pay rent at the increased rate. The trial court improperly refused to enforce the rent increase. We reverse this ruling. We also direct the trial court both to amend the judgment to include a sanctions award and to rule on two arguments concerning estoppel and agency. We otherwise affirm the judgment, including the rejection of alter ego liability. We dismiss the cross-appeal.

We also dismiss the separate appeal from an order after judgment (case No. B293883), consolidated with this case on March 28, 2019.

I

The facts begin with the identity of the plaintiff: the commercial landlord. This was Constellation-F, LLC. We refer to it and its successors collectively as Constellation unless we note otherwise.

The tenant was World Trading 23, Inc., or World Trading for short.

Constellation leased warehouse space to World Trading. The lease was for a graduated rental: base rent would increase by 150 percent if World Trading remained after the lease expired, which it did on February 28, 2016. But Constellation and World Trading amended their deal to extend the expiration date to 6:00 p.m. on April 1, 2016. This lease amendment suspended the

2

holdover rent. Constellation agreed to waive holdover rent entirely if World Trading complied with certain terms, including the new deadline.

World Trading missed the deadline. It did not vacate the premises until June 15, 2016. In response, Constellation filed an unlawful detainer action against World Trading, which (after June 15, 2016) Constellation converted to a damages action against World Trading and World Tech Toys, Inc. ("World Tech") for breach of contract. Constellation alleged World Tech was an alter ego of World Trading. Constellation sought damages for past-due rent, late fees, interest, failure to maintain and repair, costs incurred by not being able to use the premises, and holdover rent.

Before trial, the court granted Constellation's discovery motions against World Trading and awarded Constellation $1,000 in sanctions. Constellation asked for payment. World Trading would not pay.

A bench trial led the court to hold World Trading liable for all damages except the holdover rent, which the court ruled was an unenforceable penalty. The court ruled World Tech was not an alter ego of World Trading. The court awarded Constellation $13,695 and Constellation's successors $35,801.74 plus $10,000 in additional damages. The court declined to add the $1,000 sanctions to the judgment.

Constellation appealed. World Trading and World Tech cross-appealed. World Trading and World Tech then filed a separate notice of appeal in case No. B293883, appealing an order after judgment denying their request to be determined the prevailing parties and for attorney fees, and partially granting Constellation's request for attorney fees. We consolidated the

3

appeals under case No. B293033. World Trading and World Tech did not respond to Constellation's opening brief, file their own opening brief on cross-appeal, or file their own appellants' brief in their separate appeal.

## II

The trial court erred by ruling the commercial holdover provision was an unlawful penalty.

Our review of this legal question is independent. (*Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 794.)

The lease clause in this case specified rent would increase after the lease expired. The case law refers to such a clause as a holdover rent provision or as "a graduated rental." (*Vucinich v. Gordon* (1942) 51 Cal.App.2d 434, 435, 437 (*Vucinich*).) Commercial provisions of this sort are enforceable even if the increased rent is much greater than the base rent. (*Id.* at pp. 435 and 437–438 [500 percent increase enforced].)

The *Vucinich* decision is controlling here. It bears close study. It began with the presumption that the leasing market is competitive and that market actors are freely able to contract in their own best interest. (See *Vucinich, supra*, 51 Cal.App.2d at p. 437.)

This presumption of competition in the commercial leasing market fits common experience. In Southern California, at least, many different people own many different parcels of land. These are the sellers in the leasing market. The buyers in this market are the many enterprises that would like to lease those commercial premises.

Transactors in a competitive market are "free from obligation to each other" when they enter their lease contract. (*Vucinich, supra*, 51 Cal.App.2d at p. 437.) "They dealt at arm's

4

length.  Deliberately and *free from coercion*, they made the provision for the rental to be paid for the use of the premises after the expiration of the definite term.  This they had the right to do." (*Ibid.*, italics added.)

The *Vucinich* decision validates this commercial holdover provision.

The trial court mistook *Vucinich* merely as "a case that dealt primarily with a merger of fee title and leasehold interest." But the *Vucinich* defendant made the same erroneous argument as World Trading did:  the holdover provision is a penalty void under section 1671 of the Civil Code.  (*Vucinich, supra,* 51 Cal.App.2d at p. 437.)  *Vucinich* rejected this erroneous argument:  "Neither the question of penalty nor of liquidated damages is involved in this action." (*Ibid.*)  That holding applies here.

The textual logic of *Vucinich*'s holding about Civil Code section 1671 is apparent upon reflection.  At that time, section 1671 of the Civil Code stated that contracting parties could agree on an amount that would be "presumed to be the *amount of damage* sustained by a breach thereof," but only when, "from the nature of the case, it would be impracticable or extremely difficult to fix the actual *damage*." (Former Civ. Code, § 1671, italics added.)

Textually, the statute did not fit the facts.  The statute applied to an "amount of damage."  By contrast, however, a holdover clause provides for "a graduated rental." (*Vucinich, supra*, 51 Cal.App.2d at p. 435.)  Graduated rentals are not damages.  A graduated rental is the rate for leasing property.  By its terms, then, Civil Code section 1671 did not apply to a

5

holdover rent provision, as *Vucinich* held.  (*Vucinich, supra,* 51 Cal.App.2d at p. 437.)

A parallel policy rationale reinforces this textual analysis. Civil Code section 1671 and the case law interpreting it aim to combat unfair and unreasonable *coercion* arising from an imbalance of bargaining power.  (See *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 734, 740 [punitive charges for consumers' late payments of loan installments are attempts by financial institutions to coerce timely payments by levying unreasonable forfeitures] (*Garrett*); *Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 978, 980 [same] (*Ridgley*).)

The core problem is that such a coercive arrangement, "viewed from the time of making the contract, realistically contemplates *no element of free rational choice* on the part of the obligor insofar as his performance is concerned . . . ."  (*Blank v. Borden* (1974) 11 Cal.3d 963, 971 (*Blank*), italics added.)

When the concern about oppressive coercion is absent, Civil Code section 1671 does not apply.  (See *Blank, supra,* 11 Cal.3d at p. 970 [withdrawal-from-sale clause in an exclusive-right-to-sell contract does not constitute a void penalty provision]; see *id.* at p. 972 ["First, it is important to recognize that we are not here concerned with a situation wherein the party who seeks to enforce the clause enjoyed a *vastly superior bargaining position* at the time the contract was entered into.  On the contrary, the contract before us was one which was freely negotiated by parties dealing at arm's length."] italics in parenthetical added.)

Concerns about coercion are absent when one side has "a considerable range of choice as to the type of arrangement [it] wishes to enter" with the other side.  (*Blank, supra,* 11 Cal.3d at p. 972, fn. 8.)

6

In one pertinent respect, the law has changed since the 1942 decision in *Vucinich*. In 1977, the Legislature revised Civil Code section 1671 to delete the presumption that a liquidated damages clause in a commercial context is invalid, and to replace it with a presumption of validity. (*El Centro Mall, LLC v. Payless Shoesource, Inc.* (2009) 174 Cal.App.4th 58, 62–63 (*El Centro*); but see *Harbor Island Holdings v. Kim, supra*, 107 Cal.App.4th at pp. 796–797, 799 [failing to note or to give effect to 1977 change in statute].) This change put the burden on the party seeking to invalidate a contractual provision. (*El Centro, supra*, 174 Cal.App.4th at p. 63.) That party was World Trading.

World Trading failed to show this holdover provision amounted to an illegal liquidation of damages. *Vucinich* presumed transactors in a competitive market are free to negotiate a deal best for their situation. The burden of attack was on World Trading because it was the one seeking to invalidate this presumptively valid provision. (Civ. Code, § 1671, subd. (b); *El Centro, supra*, 174 Cal.App.4th at pp. 62–63.)

World Trading never overcame this burden. It never proved Constellation had market power, which is the power a monopolist has to oppress consumers by setting price at the monopolist's whim. (See, e.g., *United States v. Aluminum Co. of America* (2d Cir. 1945) 148 F.2d 416, 424–426 (Learned Hand, J.) [91 percent of a market amounts to monopoly and gives the monopolist the power to raise price as it chooses].)

When buyers face a monopolist, they have no competitive alternative. They are subject to the monopolist's oppressive coercion. But World Trading failed to establish it faced monopoly coercion from Constellation when the parties struck their bargain. (Cf. *Vucinich, supra*, 51 Cal.App.2d at p. 437

7

["Deliberately and *free from coercion*, they made the provision for the rental to be paid for the use of the premises after the expiration of the definite term"] italics in parenthetical added.)

Given this failure by World Trading, the trial court should have enforced the holdover agreement, "which the parties [had] determined by their free, solemn and voluntary act." (*Vucinich, supra,* 51 Cal.App.2d at p. 438; see also *Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 649–651.)

Nor was World Trading subject to coercion after the lease amendment. World Trading was at complete liberty to avoid the higher rent. It had merely to leave. (See *Vucinich*, *supra*, 51 Cal.App.2d at p. 438.)

The trial court cited inapposite cases.

Two cited cases, *Garrett* and *Ridgley*, concerned late fees on home loan installment payments. *Garrett* was a class action attack by residential home owners on late charges in their home loan contracts. (See *Garrett, supra*, 9 Cal.3d at pp. 734 & 739.) *Ridgley* was a suit by Robert and Marlene Ridgley, who successfully challenged a penalty for late payment of a loan to build a single-family home. (*Ridgley, supra*, 17 Cal.4th at pp. 974 & 979.) *Garrett* and *Ridgley* concerned neither graduated rentals nor commercial holdovers. Neither cited *Vucinich*. Neither applies here.

World Trading also cited *El Centro*, which upheld a commercial lease provision because the tenant failed to overcome the presumption of validity that commercial lease provisions enjoy. (*El Centro*, *supra*, 174 Cal.App.4th at pp. 62 & 65.) This holding supports Constellation.

In sum, this commercial holdover provision was valid. Constellation was entitled to enforce it against World Trading.

## III

The trial court ruled World *Trade* is liable for damages in this case but World *Tech* is not. On appeal, Constellation argues World Tech and World Trade are jointly and severally liable under three theories: alter ego, estoppel, and agency. The alter ego argument fails. We remand the estoppel and agency arguments.

First we address alter ego liability. We do not disturb the trial court's conclusion on this question of fact if it is supported by substantial evidence. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072.)

A plaintiff seeking to invoke the alter ego doctrine must prove two conditions: (1) unity of interest and ownership between the two entities and (2) an inequitable result if the two entities are not equally liable. (*Eleanor Licensing LLC v. Classic Recreations LLC* (2018) 21 Cal.App.5th 599, 615–617 (*Eleanor*).)

The trial court rightly found insufficient evidence on the second condition, concluding Constellation did not show it would be "contrary to the interests of justice to regard the two entities separately." At trial, a corporate officer testified World Tech was its own corporation but also a "d.b.a." of World Trading. World Trading presented itself as World Tech "for brand identification" and the two were "basically the same business." The shareholders and directors were the same for both companies. While this evidence shows unity of interest and ownership, it does not show treating World Trading and World Tech as separate entities would promote injustice. The fact that one company does business as another does not, without more,

support an alter ego finding. (See *Eleanor*, *supra*, 21 Cal.App.5th at pp. 616–617.)

In this court, Constellation cites to no trial evidence showing it would be contrary to the interests of justice to regard the two entities separately.

The trial court's alter ego ruling thus survives Constellation's attack.

Now we turn to the estoppel and agency liability theories. The trial court did not rule on these theories. Constellation asks us to take up these new questions. We decline. We direct the trial court to rule on these arguments.

At oral argument, Constellation's counsel conceded it was conventional for a reviewing court to remand arguments that the trial court had not addressed. We follow convention and do not rule on the estoppel and agency liability theories.

We affirm the trial court's finding that World Tech was not jointly and severally liable as an alter ego of World Trade and remand Constellation's estoppel and agency arguments for the trial court to decide.

IV

We direct the trial court to include the $1,000 sanctions in the final judgment. The trial court had awarded Constellation $1,000 in sanctions against World Trading for discovery abuse. World Trading did not pay the sanctions. The trial court rejected Constellation's proposal to include the sanctions in the final judgment, perhaps suggesting it might handle the matter with the bill of costs. However, it never did.

World Trading did not file a response brief in this appeal, and thus does not oppose Constellation's appellate request to include the sanctions award in the judgment.

10

Sanctions orders have the force and effect of a money judgment.  (*Newland v. Superior Court* (1995) 40 Cal.App.4th 608, 615.)  In the context of this case's process, it is proper and efficient to add this sanctions award directly into the judgment.  We therefore direct the trial court on remand to modify the judgment to include the $1,000 in sanctions owed to Constellation.

V

World Trading and World Tech filed a cross-appeal on October 10, 2018.  World Trading and World Tech then filed a separate notice of appeal in case No. B293883 on November 15, 2018, appealing an order after judgment denying their request to be determined the prevailing parties and for attorney fees, and partially granting Constellation's request for attorney fees.  We consolidated the cases on March 28, 2019.  World Trading and World Tech did not file any briefing in their cross-appeal or in this appeal.  We dismiss the cross-appeal and the separate appeal from the order after judgment as abandoned.

## DISPOSITION

The portion of the judgment denying Constellation holdover rent is reversed. The trial court must hold a hearing and modify the judgment to include the holdover rent due to Constellation. We direct the trial court to include in the judgment the $1,000 sanctions award to Constellation. We further direct the trial court to rule on Constellation's arguments concerning estoppel and agency as to World Tech. We otherwise affirm the judgment, including the rejection of alter ego liability. We dismiss World Trading and World Tech's cross-appeal.

We dismiss World Trading and World Tech's appeal from an order after judgment.

Costs to Constellation.

WILEY, J.

I CONCUR:

BIGELOW, P. J.

12

**STRATTON, J., Dissenting**.

The primary question presented is whether the liquidated damages provision in a pre-printed commercial lease, which established the holdover rent at 150 percent of the base rent, is an unenforceable penalty.  I agree with the trial court that it is and so would affirm.

As set out below, our Supreme Court has clearly explained how to analyze the enforceability of liquidated damages provisions.  It did so in *Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970 (*Ridgley)* and *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731 (*Garrett*).  My problem with the majority opinion is that it completely disregards the test set out in *Ridgley* and *Garrett* and instead superimposes a new test by which one may challenge a liquidated damages provision.  Under the majority's new test, contracting parties need not attempt to tether a liquidated damages provision to estimated anticipated losses; instead a challenger must analyze each contracting party's respective market power and persuade a court that there was enough of an imbalance of market power between the parties to invalidate the damages provision.  The majority establishes this new test by blithely confining *Ridgely* and *Garrett* to their specific facts, as if the decisions are outliers which we are free to ignore.  I take issue with that approach.

The lease at issue was a preprinted form lease published by AIR Commercial Real Estate Association (AIR).  The holdover rent provision read as follows:

1

"26. No Right To Holdover.  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.  Holdover Base Rent shall be calculated on a monthly basis.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee."

The parties later amended and extended the lease.  The amendment made clear that:

"4. All of the original terms of the Lease including the holdover provision for increased Base Rent are hereby ratified, restated and remain in full force and effect, except as expressly modified herein."

When World Trading missed the new extended deadline and remained in possession of the property without paying rent, Constellation ultimately sued for breach of contract.  After a multi-day bench trial, the trial court found World Trading had breached the lease.  The court held World Trading liable for damages alleged by Constellation except the holdover rent, which the court ruled was an unenforceable penalty.  Instead, the court awarded the overdue rent at the base amount of $14,500 per month.

### *The Liquidated Damages Provision is an Unenforceable Penalty.*

Validity of holdover rent provisions is determined under Civil Code[1] section 1671, subdivision (b), which provides: "[A] provision in a contract liquidating the damages for the breach of contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." Section 1671 applies to leases of real property. (§1951.5)

In *Ridgley,* our Supreme Court explained how to apply section 1671. "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a beach. The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.' [Citation.] In the absence of such relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty.' [Citation.]" (*Ridgley, supra,* 17 Cal.4th at p. 977.)

Under California law, a " 'penalty provision operates to compel performance of an act [citation] and usually becomes effective only in the event of default [citation] upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach [citation].' " (*Ridgley, supra,* 17 Cal.4th at p. 977.) The " 'characteristic feature of a penalty is

---

[1]    All further undesignated statutory references are to the Civil Code, unless otherwise indicated.

the lack of a proportional relation to the damages which may actually flow from the failure to perform under a contract.' " (*Ibid.*; *Greentree Financial Group, Inc. v. Execute Sports, Inc.* (2008) 163 Cal.App.4th 495, 497.)

Therefore, the general rule for whether a contractual condition is an unenforceable penalty requires the comparison of (1) the value of the money or property forfeited or transferred to the party protected by the condition to (2) the range of harm or damages anticipated to be caused that party by the failure of the condition. If the forfeiture or transfer bears no reasonable relationship to the range of anticipated harm, the condition will be deemed an unenforceable penalty. (*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc. (2015)* 232 Cal.App.4th 1332, 1355, 1358.)

To be sure, a liquidated damages provision is not invalid merely because it is intended to encourage a party to perform, so long as it represents a reasonable attempt to anticipate the losses to be suffered. (*Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 656.) Thus, there must be evidence tying the liquidated damages provision to a reasonable estimate of anticipated losses. An exception to section 1671's requirements of a "reasonable endeavor" occurs when the fixing of actual damages which would be sustained upon a breach would be

4

"impracticable" or "extremely difficult." (*Garrett, supra,* 9 Cal.3d at pp. 738-739.)[2]

Here the undisputed evidence established that neither Constellation nor World Trading made any effort whatsoever to determine, together or separately, an estimate of anticipated losses if World Trading overstayed its lease. Nor was there evidence of extreme difficulty or impracticability in setting damages. Not surprisingly, the trial court found that when the parties executed the lease and the amendment, they did not make a reasonable attempt to estimate Constellation's losses in the event of a breach. They never discussed the provision in any way. The trial court concluded that without evidence of an effort by the parties to arrive at a reasonable estimate of anticipated losses due to breach, the holdover rent provision was untethered to anticipated losses and was therefore an unenforceable penalty. The trial court correctly followed the analytical contours of *Ridgley* and *Garrett.*

1. Freedom of Contract

Constellation does not challenge this factual finding on appeal and it remains undisputed. Instead, Constellation argues the trial court should not have found the holdover provision unenforceable as a penalty because the lease was freely contracted by two business entities. However, that this was a commercial lease presumably negotiated by seasoned business

---

[2] Section 1671's presumption of invalidity was changed after *Garrett* to a presumption of validity. Thus it is incumbent on the challenger, here World Trading, to show that the liquidated damages provision was not the result of a reasonable endeavor by the parties to estimate anticipated damages. World Trading carried its burden.

entities, not a consumer lease between unsophisticated individuals, has no bearing on the analysis. (*Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 799.) As the *Ridgley* court explained: That the obligors "are small business owners rather than consumers, however, does not deprive them of section 1671's protection against unreasonable penalties . . . ." (*Ridgley, supra,* 17 Cal.4th at p. 981, fn.5.)

2.    Alternative Performance

Constellation next argues that the 150 percent holdover rent increase was not a penalty, but an option for alternative performance; that is, World Trading had the option of vacating the property on time, negotiating an extension, or overstaying and paying the increased rent. Constellation contends this theory was discussed and embraced in *Garrett*. I agree *Garrett* did not eliminate the possibility of construing some lease terms as options for alternative performance. However, *Garrett* and its progeny compels me to conclude this lease cannot be construed as offering World Trading an option of alternative performance.

A classic example of a valid option for alternative performance is described in *Ridgley*, that is, a pre-payment penalty for paying off a loan early at the option of the borrowers. Payment before maturity is not a breach of the loan contract, but simply an alternative mode of performance by the borrower. Indeed, for that reason, according to *Ridgley*, it is a misnomer to call it a penalty in the sense of retribution for a breach of the agreement. (*Ridgley*, *supra*, 17 Cal.4th at p. 979.)

*Garrett* is instructive as it describes and circumscribes what can be deemed an option for alternative performance. In *Garrett*, plaintiffs in a class action were borrowers under promissory notes secured by deeds of trust. The notes provided

6

that interest of 2 percent of the unpaid balance of the loans would be charged by the lender if payment of the loans went into default.  Plaintiffs contended the interest fees were penalties. The lender bank contended the requirement of additional interest "merely gives a borrower an option of alternative performance of his obligation.  If he makes timely payments, interest continues at the contract rate; if, however, the borrower elects not to make such payments, interest charges for the loan are to be increased during the period of optional delinquency." (*Garrett, supra,* 9 Cal.3d at p. 735.)

Our Supreme Court did not adopt the bank's simplistic perspective on alternative performance.  "The mere fact that an agreement may be construed . . . to vest in one party an option to perform in a manner which, if it were not so construed, would result in a penalty does not validate the agreement.  To so hold would be to condone a result which, although directly prohibited by the Legislature, may nevertheless be indirectly accomplished through the imagination of inventive minds.  Accordingly a borrower on an installment note cannot legally agree to forfeit what is clearly a penalty in exchange for the right to exercise an option to default in making a timely payment of an installment. Otherwise the legislative declarations of sections 1670 and 1671 would be completely frustrated.  We have consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures." (*Garrett, supra,* 9 Cal.3d at p. 737, fn. omitted.)

The *Garrett* court went on to describe what is *not* a true option for alternative performance:  "Thus when it is manifest that a contract expressed to be performed in the alternative is in fact a contract contemplating but a single, definite performance

7

with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages." (*Garrett*, *supra*, 9 Cal.3d at p. 738.) The court concluded the interest provision was a penalty: "Inasmuch as this increased interest charge is assessed only upon default, it is invalid unless it meets the requirements of section 1671." (*Garrett*, at p. 738.)

The lease here contemplated one definite performance: possession of the warehouse by World Trading for a finite period of time. World Trading did not have the option to choose to stay with Constellation's blessing after April 1 as long as it paid holdover rent. This was clearly borne out by Constellation's speedy initiation of unlawful detainer proceedings to get World Trading out of the warehouse. Moreover, Constellation made very clear in the lease that it in no way consented to any holdover or further extension of the lease past April 1. This express lack of consent comported with the evidence at trial that when it executed the lease, Constellation was planning on selling the property. When it agreed to amend the lease to add a one-month extension, it already had a buyer to whom it needed to give timely possession of the property.

This was not a lease where both parties agreed to and approved an option of alternative performance. Quite the contrary. The holdover rent provision was clearly a penalty for breach of the one primary obligation World Trading had under the lease: to vacate by April 1. As both parties here did not agree to an alternative mode of performance, it is disingenuous to call it that. To construe this lease as authorizing alternative performance would also subvert the significance of the actions of the parties once World Trading failed to timely vacate.

### 3. The Pre-Printed Form Lease

To the majority, compliance with the requirements of section 1671 (then and now) means the market power of the parties to the contract must be analyzed and if no imbalance is shown, section 1671 has been satisfied. Not so. *Garrett* is clear that the amount of liquidated damages must represent the result of a "reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." (*Garrett*, *supra*, 9 Cal.3d at p. 739.) The *Garrett* court found no effort had been made to estimate anticipated damages in the event of a breach; instead the bank set the additional damages, across the board, at 2 percent of the unpaid loan balance, regardless of the balance. "We are compelled to conclude that a charge for the late payment of the loan installment which is measured against the unpaid balance of the loan must be deemed punitive in character. It . . . is not reasonably calculated to merely compensate the injured lender." (*Id*. at p. 740.) The *Garrett* court mused it "is possible that on a proper showing [the bank] might have been able to establish the impracticability of prospectively fixing its actual damages resulting from a default in an installment payment." (*Id*. at p. 741.) However, because the evidence of impracticability was lacking as well as evidence of a reasonable effort to determine anticipated damages, the interest charge was deemed an unenforceable penalty.

A similar situation exists here, in even starker relief. The undisputed evidence at trial established there were no efforts by the parties to reasonably endeavor to estimate fair average compensation for any sustained losses in the event of a breach. Instead, the pre-printed AIR form lease set the holdover rent,

9

across the board for anyone using that form, at 150 percent of base rent.

Constellation offers no plausible argument that the 150 percent rent increase in the event of a holdover was the result of a reasonable endeavor by the parties to estimate anticipated damages. Instead, it relies on the testimony of its broker, Michael Zugsmith, and its expert witness, John Pagliassotti. Zugsmith testified he has held a real estate license since 1973. He is chairman and founder of NAI Capital, Inc., which is a commercial real estate brokerage firm with 14 offices in the greater Los Angeles area. His custom is to use the AIR prepared lease form which is the most widely used form in the Southern California commercial and industrial real estate market. He acknowledged the parties did not discuss the holdover rent provision of 150 percent on the preprinted lease. He uses the AIR form because it "cuts down" on the expenses of negotiating a lease. "Most attorneys already are fully familiar with it" and have their comments about it "premade."

Pagliassotti had an even closer familiarity with the AIR form lease. He testified that AIR Commercial Real Estate is an association founded in 1960 to provide education and training and a standard of rules and ethics for its broker members. It also publishes over 50 real estate forms. AIR has 13,000 subscribers to its forms.

Pagliassotti has been an active member of the AIR Commercial Real Estate Forms committee since 2006. The Forms Committee, composed of two attorneys and other real estate professionals, meets quarterly. Forms are tested based on transactions of people in the industry who then give feedback to the committee for ongoing consideration. Pagliassotti called it

10

"one of the beauties of our form." The form leases have uniform holdover rent provisions. The reason for holdover rent is because the "landlord needs the building back, vacant." He testified that, based on his 30 years of experience with commercial leases, 150 percent holdover rent is "reasonable." Its purpose is to "provide a disincentive to the tenant to remain in possession past the lease expiration, and provide a reasonable estimate of the landlord's damages and risks should that tenant holdover."

Pagliassotti testified the committee picked and printed 150 percent in consideration of the risks *generally inherent* in holdover tenancies. Most landlords in Southern California charged between 125 and 200 percent in holdover rent so the figure of 150 seemed workable. On cross-examination Pagliassotti testified that he had done no analysis of costs incurred or estimated to occur from a breach of this particular lease.

Thus we face a uniform holdover rent provision of 150 percent of the base rent on this pre-printed lease. It is based not on what the parties to this particular lease might have estimated to be holdover damages, but on what Pagliassotti and his committee concluded was reasonable and would "work" in the industry as a whole.

That this AIR lease form is commonly employed in the commercial leasing industry does not make it legal in this particular context. A similar argument was made in *Harbor Island*, where the landlord contended that it was the policy of the state to facilitate freedom of contract by the parties to commercial leases, so he should be able to use the form lease as he deemed appropriate. The *Harbor Island* court was not having it: "[I]t is no less the public policy of this state that any provision for the

11

forfeiture of money or property without regard to the actual damage suffered constitutes an unenforceable penalty." (*Harbor Island*, *supra*, 107 Cal.App.4th at p. 799.)

Our caselaw mandates that a reasonable effort be made by the parties to a commercial lease to estimate anticipated damages in the event of a breach of contract. None was made here. I conclude the holdover rent provision is tethered to nothing but the general convenience of the AIR member subscribers, and, perhaps at best, some generalized practice in the industry. The trial court correctly found it to be an unenforceable penalty.[3]

### 4.      *Vucinich v. Gordon*

Finally, Constellation contends *Vucinich v. Gordon* (1942) 51 Cal.App.2d 434 (*Vucinich*) controls. I disagree.

The trial court reviewed *Vucinich* and concluded it was not controlling for two reasons. First, it noted the issue on appeal there was whether the merger of fee title and a leasehold interest vitiated the tenant-now-partial-owner's obligation to pay rent. Next the trial court noted correctly that *Vucinich* has "not been followed by any subsequent case as to its treatment of holdover rent."

---

[3]      There was no testimony whatsoever that estimating damages in the industry is "impracticable" or "extremely difficult" as discussed in *Garrett*. Had there been such testimony, perhaps this 150 percent rate might have passed muster.

I do not consider *Vucinich* persuasive. First, its throw-away discussion of holdover rent was dicta appearing gratuitously in the last paragraph of the decision. *Vucinich* is also a case that precedes the amendments to section 1671 and so does not discuss the statute in its current form. Most important, however, is that V*ucinich's* reliance on the option of alternative performance in contracts has been severely curtailed by our Supreme Court's analyses in *Garrett* and *Ridgley*, as set out above. A free-wheeling application of the principles of freedom of contract and elevation of the significance of the presumed equality of the contracting parties' bargaining positions is constrained by the Supreme Court's requirements that the parties make a reasonable endeavor to estimate anticipated holdover damages and link holdover rent to the results of their endeavors. Accordingly, I dissent from what appears to me to be the majority's departure from California law.

STRATTON, J.

13