[No. G040038. Fourth Dist., Div. Three. Apr. 21, 2009.]

EL CENTRO MALL, LLC, Plaintiff and Respondent, v.
PAYLESS SHOESOURCE, INC., Defendant and Appellant.

**Counsel**

Kinkle, Rodiger and Spriggs, Scott B. Spriggs and Michael F. Moon for Defendant and Appellant.

Seltzer Caplan McMahon Vitek, Neal P. Panish and Kevin O. Moon for Plaintiff and Respondent.

## OPINION

**ARONSON, J.**—Defendant Payless ShoeSource, Inc. (Payless), ceased operations at a shopping center owned by plaintiff El Centro Mall, LLC (ECM), before the end of its lease term. Per a lease provision, ECM charged Payless liquidated damages of 10 cents per square foot of leased space for each day Payless did not operate, totaling $98,010. Payless refused to pay, alleging the liquidated damages provision in the lease was an unenforceable penalty under Civil Code section 1671.[1]

Payless contends the trial court erred when it determined the provision did not constitute an unlawful penalty. Payless argues the evidence demonstrates the liquidated damages provision was arbitrarily applied to the tenants at ECM's shopping center and therefore could not be a reasonable estimate of potential damages at the time the lease was signed. ECM asserts its evidence demonstrates the liquidated damages clause was intended to reimburse ECM for the loss in synergy, goodwill, and patronage the shopping center and other tenants would lose if Payless ceased operation.

We conclude substantial evidence supports the trial court's judgment. Under section 1671, subdivision (b), the liquidated damages clause was presumptively enforceable and Payless had the burden to demonstrate otherwise. Although Payless's evidence may have given rise to an inference the clause was arbitrary, this evidence was not conclusive, and was countered by expert testimony introduced by ECM. Accordingly, we affirm.

I

### FACTUAL AND PROCEDURAL BACKGROUND

In 1990, Payless entered into a written commercial lease with ECM's predecessor in interest to lease 3,300 square feet of retail space in a shopping center for a term of 10 years, commencing on January 1, 1991, and ending on December 31, 2000 (lease). In 2000, ECM's predecessor in interest and Payless executed a "Lease Amendment/Extension Agreement" (amendment), extending the lease for five years, commencing January 1, 2001, and expiring December 31, 2005. ECM purchased the shopping center, assuming the lessor's rights under the agreement.

---

[1] All statutory references are to the Civil Code.

Under the lease terms, as amended, the base monthly rent for the period of January 1, 2005, through December 31, 2005, was $4,950. In addition to the base monthly rent, Payless also agreed to pay ECM "Percentage Rental" on a monthly basis, in a sum equal to Payless's gross sales times 6 percent, minus the aggregate amount of the minimum annual rent. Payless's rental obligations also included "Additional Rent," which covered all other costs or charges required under the lease, such as common area maintenance (CAM), costs, and taxes.

The lease also contains a covenant of "Continuous Operation." Section 17.1 provides that Payless will continuously operate and conduct business on the premises: "Tenant covenants and agrees that, continuously and uninterruptedly . . . it will operate and conduct within the premises the business which it is permitted to operate and conduct . . . ." Section 17.2 sets Payless's required hours of operation: "Tenant agrees that commencing with the opening for business by Tenant in the premises and for the remainder of the term of this Lease, Tenant shall be open[ed] for business daily from 10:00 A.M. to 9:00 P.M., Monday through Friday, 10:00 A.M. to 6:00 P.M. Saturday, 12:00 noon to 5:00 P.M. Sunday . . . ."

Section 17.3 provides that if Payless fails to operate within the lease terms, including failing to stay open for business, the lessor, five days after the first breach, "shall be entitled to collect (in addition to the minimum annual rent, Percentage Rental and Additional Rent) an additional charge at the daily rate of Ten Cents ($0.10) per square foot of the Floor Area of the premises or One Hundred Dollars ($100.00), whichever is greater, for each and every day or partial day the Tenant fails to commence to do or to carry on business as herein provided, such additional charge is a liquidated sum representing the minimum damages which Landlord is deemed to have suffered, including damages as a result of Landlord's failure to receive Percentage Rental, if any, under this Lease [and] is without prejudice to Landlord's right to claim and prove a greater sum of damages . . . ."

Payless closed its business operations from March 4, 2005, to December 31, 2005. On March 29, 2005, ECM sent Payless a letter, notifying Payless of its default and of Payless's contractual obligation to stay open for business. ECM also notified Payless of its obligation to pay the additional charge. Payless continued to pay the required base monthly rent, CAM charges, and taxes during this time period, but did not pay the liquidated damages amount called for by section 17.3 of the lease. Due to lagging sales, Payless had not

paid any percentage rental since 1999, and ECM did not assert Payless owed any percentage rental for the period during which Payless discontinued business operations.

The parties stipulated that in lieu of trial with live testimony, the trial court could decide the case pursuant to a noticed briefing schedule with written evidence. The parties stipulated to a number of facts, including alternative calculations of the damages owed, which depended on whether the trial court enforced the liquidated damages provision. The trial court ruled in ECM's favor, finding Payless did not overcome the presumption of validity with respect to the liquidated damages clause in the parties' lease agreement. The trial court awarded ECM damages of $90,226.80, based on the parties' agreed calculation of $98,010 in liquidated damages ($330 per day times 297 days), less a $7,783.20 credit owed Payless after a reconciliation of CAM charges and real property taxes for the 2005 lease term.

## II

### STANDARD OF REVIEW

Where the facts are undisputed, we review the question of whether a liquidated damages clause is enforceable de novo. (*Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 794 [132 Cal.Rptr.2d 406].) Where, as here, there is a conflict in the evidence, we review the trial court's ruling for substantial evidence supporting it. Simply put, our reviewing power in such instances " ' "begins and ends with a determination as to whether there is *any* substantial evidence to support [the factual findings]; [we have] no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or *in the reasonable inferences that may be drawn therefrom.*" [Citation.]' [Citation.]" (*People v. Orange County Charitable Services* (1999) 73 Cal.App.4th 1054, 1071–1072 [87 Cal.Rptr.2d 253], original italics.)

## III

### DISCUSSION

In 1977, the Legislature revised section 1671 by deleting the presumption that a liquidated damages clause in a commercial context is invalid, and replacing it with a presumption of validity. (*Californians for Population*

*Stabilization v. Hewlett-Packard Co.* (1997) 58 Cal.App.4th 273, 289 [67 Cal.Rptr.2d 621].) As revised, section 1671, subdivision (b), now provides: "[A] provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."

The Law Revision Commission comment to section 1671 explains: "In the cases where subdivision (b) applies, the burden of proof on the issue of reasonableness is on the party seeking to invalidate the liquidated damages provision. The subdivision limits the circumstances that may be taken into account in the determination of reasonableness to those in existence 'at the time the contract was made.' The validity of the liquidated damages provision depends upon its reasonableness at the time the contract was made and not as it appears in retrospect. Accordingly, the amount of damages actually suffered has no bearing on the validity of the liquidated damages provision. . . .

"Unlike subdivision (d), subdivision (b) gives the parties considerable leeway in determining the damages for breach. All the circumstances existing at the time of the making of the contract are considered, including the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract. Other relevant considerations in the determination of whether the amount of liquidated damages is so high or so low as to be unreasonable include, but are not limited to, such matters as the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract." (Cal. Law Revision Com. com., 9 West's Ann. Civ. Code (1985 ed.) foll. § 1671, p. 498.)

■ The objective of a liquidated damages clause is to "stipulate[] a pre-estimate of damages in order that the [contracting] parties may know with reasonable certainty the extent of liability" in the event of breach. (*ABI, Inc. v. City of Los Angeles* (1984) 153 Cal.App.3d 669, 685 [200 Cal.Rptr. 563].) Courts perform a " 'reasonable endeavor' " test to determine the validity of the liquidated damages provision measured at the time of contracting: "The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.' " (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977 [73 Cal.Rptr.2d 378, 953 P.2d 484].)

■ In determining whether the liquidated damages provision is enforceable, we consider the purposes stated in the provision itself, which provides the liquidated damages specified "represent the minimum damages which the Landlord is deemed to have suffered, including damages as a result of Landlord's failure to receive Percentage Rental." Payless counters by citing section 23.5 of the lease, which provides that the amount of percentage rental to be paid as damages if the lessor terminates the lease based on a tenant's default "shall be computed on the basis of the average monthly amount thereof accruing during any preceding twelve (12) month period selected by the Landlord occurring within the preceding five (5) year period, except that if it becomes necessary to compute such rental before such a twelve (12) month period has occurred then such rental shall be computed on the basis of the average monthly amount hereof accruing during such shorter period."

We conclude the liquidation provision, to the extent considered only as a basis for estimating percentage rental damages, is an unenforceable penalty. Section 23.5 of the lease provides a readily ascertainable basis for calculating damages for loss of percentage rental, rendering the additional liquidated damages provision unnecessary, except to penalize Payless.

ECM, however, contends other damages included in the liquidated damages provision also include the anticipated loss of the synergy, goodwill, and patronage Payless provides by continuing to operate in the retail center. ECM introduced the declaration of an expert witness who explained that a store such as Payless is viewed as a "national tenant" because it conducts retail business throughout the United States, often supported by national and regional advertising campaigns. This allows such stores to generate significant patronage or " 'foot traffic' " in a retail center. In recognition of this fact, retail centers customarily require a covenant of continuous operation. Because it is difficult to estimate the amount of damages from the loss of synergy, goodwill, and patronage accompanying the breach of the continuous operation covenant by a national tenant such as Payless, the landlord will typically require a reasonable liquidated damages calculation. "The rationale for such a liquidated calculation is based upon the theory that the amount of business that a retail tenant may prospectively generate in patronage, synergy or goodwill to the retail center, and in sales, is directly proportional to the amount of space the retail tenant utilizes to conduct business in the retail center. By way of example, a shoe store with a floor area of 100 square feet (a shoe 'kiosk'), or a small coffee hut or 'kiosk,' will not generate as many shoe sales or coffee sales as a full retail shoe store with a floor-area of 3,300 square feet, such as the Payless store here, or as a 'Starbucks' coffee store. The larger stores would be able to carry more styles, brands, and shoes, or coffee and coffee-related supplies than [the] smaller counterpart. As a result, the larger store is likely to conduct more business, generate more goodwill to

the retail center, generate more patronage to the retail center, generate more and better complementary tenants at increased rents and also generate more percentage rent."

In opposition, Payless produced evidence that ECM allowed Sears, an anchor tenant in the shopping center, to escape from its lease obligations for a 65,000-square-foot space without the payment of any damages for loss of synergy, goodwill, or patronage. Payless also notes that other tenants lacking Payless's national stature were required to pay similar liquidated damages. Specifically, ECM's leases with General Nutrition Corporation (GNC), which leases 1,200 square feet, Sports Image, which leases 2,000 square feet, and The Locker, which leases 1,200 square feet, have lease provisions identical to the liquidated damages provision in section 17.3. Moreover, ECM's lease with Nail Trix, Inc., requires liquidated damages for cessation of operations of $250 per day, despite leasing only 1,000 square feet.

Payless contends the foregoing evidence demonstrates the lease's liquidated damages provision is arbitrary and does not represent a reasonable attempt to estimate future damages for breach of the continuous operation provision. Although we agree Payless's evidence may give rise to an inference the provision is arbitrary, it does not conclusively prove the point. Significantly, Payless provides little or no evidence allowing any detailed analysis of the circumstances surrounding the other leases. For example, ECM may have let Sears out of its lease because an event occurred giving Sears the right to terminate under a lease provision. Alternatively, ECM may have agreed not to include a liquidated damages provision to persuade Sears to become an anchor tenant. Moreover, Nail Trix, Inc., may be paying a higher cost per square foot because it generates more customers, and thus has more foot traffic, per square foot, than a typical retail business. Finally, Payless presented no evidence of whether GNC, Sports Image, or The Locker were or were not national tenants, like Payless.

Payless also failed to present evidence, usually presented through expert testimony, that showed a charge of 10 cents per square foot did not represent a reasonable estimate of the actual damages a retail center would suffer if a tenant like Payless ceased operations. Payless had the burden of proof to demonstrate the liquidated damages provision in section 17.3 of the lease was not intended by the parties to be a reasonable estimate of damages, but was instead a penalty. The trial court determined Payless did not meet its burden. Because the trial court's decision is supported by substantial evidence, we do not disturb it here.

## IV

### DISPOSITION

The judgment is affirmed. ECM is entitled to its costs of this appeal.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

On May 21, 2009, the opinion was modified to read as printed above.