Filed 4/6/21  Micrel v. Zinn CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MICREL, LLC,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>RAYMOND ZINN,<br><br>      Defendant and Appellant. | A157136, A158069<br><br>(San Mateo County<br>Super. Ct. No. CIV538785) |

Plaintiff Micrel, LLC (Micrel) sued defendant Raymond Zinn for breach of a non-defamation clause in a contract, and it sought approximately $1.3 million in damages under a liquidated damages provision.  After a bench trial, the trial court found that the provision was unreasonable and unenforceable under Civil Code[1] section 1671, subdivision (b).  Since Micrel did not seek actual damages, the court entered judgment in Zinn's favor, and it subsequently awarded him most, but not all, of his attorney fees.

Micrel and Zinn both appeal from the judgment and fees order.  Micrel contends that the trial court erred by focusing on the process by which the company arrived at the $1.3 million figure instead of on the reasonableness of the amount itself.  We perceive no error.  Nor do we agree with Zinn that

---

[1] All statutory references are to the Civil Code.

1

certain inaccuracies in the fees order cast doubt on the court's discounted award. Thus, we affirm both the judgment and the fees order.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

In 2014, Micrel, Incorporated (Micrel, Inc.) and Zinn, its chief executive officer (CEO), entered into a "Change in Control and Severance Agreement" (change-in-control agreement). This agreement required Micrel, Inc. to pay Zinn certain benefits, including two years of salary and a pro rata share of his annual bonus, if the company were acquired.

In May 2015, Micrel, Inc. was acquired by Microchip Technology Inc. (Microchip) in a two-step merger. In the first step, Micrel, Inc. merged with a subsidiary of Microchip. In the second step, Micrel, Inc. merged with another Microchip subsidiary, and Micrel, Inc. was extinguished as an entity and renamed Micrel, LLC (plaintiff here). Microchip's CEO, Steve Sanghi, became Micrel's CEO. Before Micrel, Inc. was extinguished, it and Zinn entered into a severance agreement, which was created by Microchip to terminate Zinn's employment and set forth his termination benefits and obligations.

A Microchip employee incorporated the amount of the employee benefits mentioned in the 2014 change-in-control agreement into the severance agreement. As a result, in Paragraph 3, titled "Severance Benefit," Zinn was promised about $1.3 million: $882,626.26 to reflect two years of base income, $400,000 to reflect an annual bonus, and additional benefits such as extended health care coverage and stock benefits.[2]

---

[2] Early in the litigation, the trial court granted Zinn's motion to seal the severance agreement. Nevertheless, the court's written statement of decision identifies various details of the agreement, including the amount of

2

The severance agreement contained a non-defamation clause, which prohibited Zinn from "directly or indirectly, in public or private, deprecat[ing], impugn[ing,] or otherwise mak[ing] any remarks that would tend to or be construed to tend to defame Micrel or its reputation." The agreement also contained a liquidated damages provision, which required Zinn to remit almost all of the approximately $1.3 million he received in severance benefits should he breach the agreement in any respect. Specifically, Paragraph 20, titled "Consequences of Employee Violation of Promises," stated as follows:

> "If Employee breaks any of his promises contained within this Agreement and/or files any lawsuit based on legal claims that Employee has released, Employee will pay for all costs incurred by Micrel . . . to enforce any provisions or to defend against any claim by Employee. Employee also agrees that if Employee acts in violation of this Agreement, Employee will remit to Micrel any and all monies paid to Employee under this Agreement, with the exception of $100.00."

In a 2016 interview with an electronics publication, Zinn made negative statements about Microchip's acquisition of Micrel, Inc., Microchip, Sanghi, Microchip's closure of a Micrel, Inc. production facility, and Microchip's layoff of numerous Micrel, Inc. employees. Micrel brought this action against Zinn, alleging that his statements violated the non-defamation clause, and sought liquidated damages under Paragraph 20.

After a bench trial, the trial court ruled that Paragraph 20 was unenforceable. Citing *Cellphone Termination Fee Cases* (2011) 193 Cal.App.4th 298 (*Cellphone Termination*), the court explained that the validity of a liquidated damages provision depends on whether the drafting

---

the liquidated damages provision, as does Zinn's publicly filed briefing in this court. We therefore find it appropriate to do so as well.

3

entity " 'actually engaged in some form of analysis to determine what losses it would sustain from a breach and . . . made a genuine and non-pretextual effort to estimate a fair average compensation for the losses to be sustained.' " The court found no evidence that any such analysis was undertaken, and it found no evidence that "the amount of the liquidated damage figure"— approximately $1.3 million—"bore a reasonable relationship to[ the] damages [Micrel] would be expected to actually suffer."

At the request of Micrel, which conceded that it did not "have actual damages in this case" and was "relying on the liquidated damages clause," the trial court entered judgment in favor of Zinn in March 2019. Four months later, under an attorney fees provision in the severance agreement, the court awarded Zinn $1,778,500 in attorney fees, approximately $350,000 less than he originally requested. Micrel appealed from the judgment in No. A157136 and from the order awarding attorney fees in No. A158069, and Zinn cross-appealed in both cases. We consolidated the appeals.

II.
DISCUSSION

A.    *The Trial Court Properly Determined that the Liquidated Damages Provision Was Unenforceable.*

Micrel contends that the trial court erred by concluding that Paragraph 20 was invalid based on its finding that the company "did not engage in a 'reasonable endeavor' to estimate the range of damages that might flow from" breach of the non-defamation clause. It argues that the focus of the analysis must be on the amount of liquidated damages, which it

4

contends was reasonable, not the process by which that amount was set. We conclude there was no error.[3]

### 1. Legal background and standard of review

A liquidated damages clause "stipulates a pre-estimate of damages" so "the parties may know with reasonable certainty the extent of liability" in the event of breach. (*ABI, Inc. v. City of Los Angeles* (1984) 153 Cal.App.3d 669, 685.) Under California law, different standards for reviewing the legality of such a clause apply depending on whether the clause is in a consumer or a non-consumer contract. Originally, section 1671 provided that a liquidated damages provision in any type of contract was presumptively invalid, unless "from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage." (Former §§ 1670–1671.) Effective July 1, 1978, however, the Legislature amended section 1671 to its current form favoring liquidated damages provisions except in certain contracts and leases, including contracts for the sale or lease of consumer goods and services. (*Hong v. Somerset Associates* (1984) 161 Cal.App.3d 111, 114.)

Now, as a result of the 1978 change, if a liquidated damages provision is in a non-consumer contract, which the severance agreement concededly is, the provision "is valid unless the party seeking to invalidate [it] establishes that [it] was unreasonable under the circumstances existing at the time the contract was made." (§ 1671, subd. (b).) But if the provision is in a consumer contract, it "is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it

---

[3] In light of our conclusion, we need not address Zinn's claim that the judgment must be affirmed for the independent reason that the trial court incorrectly concluded that the severance agreement covered defamatory statements about Micrel as well as Micrel, Inc.

5

would be impracticable or extremely difficult to fix the actual damage."
(§ 1671, subds. (c)–(d).)  In other words, a liquidated damages provision is presumed valid if it is in a non-consumer contract but presumed invalid if it is in a consumer contract.  (See *Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977 (*Ridgley*).)  Thus, whereas before 1978 the burden was on the party seeking to enforce a liquidated damages provision in a non-consumer contract to prove its enforceability, the burden is now on the party seeking to avoid the provision to prove its unenforceability.

"A liquidated damages clause [in a non-consumer contract] will generally be considered unreasonable, and hence unenforceable under section 1671[, subdivision ](b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach.  The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.'  [Citation.]  In the absence of such relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty. . . .  The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract.' " (*Ridgley*, *supra*, 17 Cal.4th at p. 977.)

Courts are given wide latitude in evaluating the reasonableness of a liquidated damages provision.  In performing such an evaluation, " '[a] court should place itself in the position of the parties at the time the contract was made and should consider the nature of the breaches that might occur and any consequences that were reasonably foreseeable.' " (*Krechuniak v. Noorzoy* (2017) 11 Cal.App.5th 713, 722–723, quoting *Better Food Mkts. v. Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179, 185.)  " 'All the circumstances

6

existing at the time of the making of the contract are considered, including the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract. Other relevant considerations . . . include, but are not limited to, such matters as the relative equality of the bargaining power of the parties, whether the parties were represented by lawyers at the time the contract was made, the anticipation of the parties that proof of actual damages would be costly or inconvenient, the difficulty of proving causation and foreseeability, and whether the liquidated damages provision is included in a form contract.' " (*El Centro Mall, LLC v. Payless ShoeSource, Inc.* (2009) 174 Cal.App.4th 58, 63 (*El Centro*).)

"[I]t is essentially a factual question whether the parties reasonably estimated foreseeable damages under the prevailing circumstances" (*Krechuniak v. Noorzoy*, *supra*, 11 Cal.App.5th at p. 723), and when "there is a conflict in the evidence, we review the trial court's ruling for substantial evidence supporting it." (*El Centro*, *supra*, 174 Cal.App.4th at p. 62.) But if "the facts are undisputed and susceptible of only one reasonable interpretation," the reasonableness of a liquidated damages provision "becomes a question of law" that we review de novo. (*Krechuniak*, at p. 723; accord *Vitatech Internat., Inc. v. Sporn* (2017) 16 Cal.App.5th 796, 808.)

2. Analysis

As Micrel recognizes, numerous decisions state that the amount of liquidated damages "must represent the result of a reasonable endeavor" to determine the damages that might stem from a breach, including post-1978 decisions addressing non-consumer contracts. (E.g., *Ridgley*, *supra*, 17 Cal.4th at p. 977; *Graylee v. Castro* (2020) 52 Cal.App.5th 1107, 1114–1115; *Vitatech Internat., Inc. v. Sporn*, *supra*, 16 Cal.App.5th at pp. 805–806.)

7

In essence, Micrel argues that despite this authority, no "reasonable endeavor" must actually be made. Rather, according to Micrel, the amount of liquidated damages "is the principal or sole basis for determining whether [the provision] is enforceable." Micrel argues that the trial court therefore erred in relying on cases, most notably *Cellphone Termination, supra,* 193 Cal.App.4th 298, to focus on the *process* of how the amount of liquidated damages was fixed instead of on whether the *amount* itself is reasonable. We are not persuaded.

Micrel primarily relies on *Utility Consumers' Action Network, Inc. v. AT&T Broadband of Southern Cal., Inc.* (2006) 135 Cal.App.4th 1023 (*UCAN*), which it describes as the "most important and instructive case for this Court to consider." *UCAN* considered the enforceability of a liquidated damages provision in a form, mass-consumer contract. The parties conceded that the amount of liquidated damages—a late fee that "did not exceed $4.75"—was reasonable, and the plaintiff consumer group did not dispute that the defendant company had performed a reasonable analysis in arriving at that amount. (*UCAN,* at pp. 1025–1026, 1038, fn. 9.) Rather, the issue presented was whether the reasonable endeavor test required a company to "sit down and negotiate the late fee amount individually with each customer." (*Id.* at p. 1025.) After exhaustively tracing the history of the reasonable endeavor test, the Second District Court of Appeal concluded that the test "looks primarily to the intent of the parties, as determined by the purposes behind a liquidated damages clause and the relationship between the amount of liquidated damages and a fair estimate of the actual damages from a breach of the contract." (*Id.* at pp. 1029–1038.) The court determined that "those standards are not necessarily undermined by nonnegotiated liquidated damages provisions" in "mass consumer transactions," and it refused to

8

"requir[e] a large enterprise to negotiate the terms of a late fee provision with thousands or hundreds of thousands of potential customers . . . even when the amount selected by the business was designed to do no more than cover its damages and bore the proper relationship to the amount of such damages." (*Id.* at p. 1038.)

Subsequently, in *Cellphone Termination*, Division Five of this court addressed a related issue involving the liquidated damages provision of another mass-consumer contract, the defendant wireless telephone carrier's early termination fee. The decision held that "to establish the reasonable endeavor required, evidence must exist that the party seeking to impose liquidated damages ' "actually engaged in some form of analysis to determine what losses it would sustain from [a] breach, and that it made a genuine and non-pretextual effort to estimate a fair average compensation." ' " (*Cellphone Termination*, *supra*, 193 Cal.App.4th at pp. 322–323, quoting *Hitz v. First Interstate Bank* (1995) 38 Cal.App.4th 274, 291.) This court agreed with the consumer plaintiffs "that the reasonable endeavor test, to have any meaning, must necessarily focus on those circumstances actually considered in evaluating a liquidated damage provision, not post hoc rationalization." (*Cellphone Termination*, at p. 326.) Because the evidence "fail[ed] to establish any endeavor, reasonable or otherwise, to even approximate [the carrier's] actual damages flowing from breach . . . , and instead reflect[ed] a marketing decision made with an entirely deterrent purpose and focus," *Cellphone Termination* affirmed the trial court's invalidation of the early termination fee. (*Id.* at pp. 303, 326.)

We need not determine whether *UCAN* was correctly decided or resolve any supposed conflicts between it and *Cellphone Termination*. This is because nothing about *UCAN* or any of the other authorities Micrel cites

9

suggests that courts are *prohibited* from considering the process by which a liquidated damages amount is set in determining the reasonableness of the provision. Thus, while we accept that courts may consider the amount of liquidated damages as a factor in evaluating reasonableness, we reject Micrel's arguments that the amount is necessarily the sole or primary consideration. Whether an effort to estimate damages was actually made when a contract was entered is clearly relevant (see *El Centro, supra*, 174 Cal.App.4th at p. 63), and we see no reason to limit consideration of that factor just because a liquidated damages provision in a non-consumer contract is presumed valid.[4] Even though the amendment of section 1671 shifted the burden of proof to the party seeking to avoid such a provision, there is no reason to conclude that the law changed the substantive standards for determining reasonableness.

Indeed, consideration of whether a reasonable endeavor was actually made is especially appropriate in cases, such as this one, in which the liquidated damages amount is not conceded to be reasonable. The facts here suggest the $1.3 million figure was incorporated into the severance agreement simply because it was the amount of the change-in-control agreement's severance benefit, not because of any consideration of or connection to potential defamation-related damages. Micrel, Inc.'s board of directors drafted the change-in-control agreement a year before Microchip acquired Micrel, Inc. and long before Microchip drafted the severance

---

[4] At oral argument, Micrel insisted that a court is precluded from considering the process by which the amount of liquidated damages was fixed under *Better Food*, the first decision to use the phrase "reasonable endeavor." (*Better Food Mkts. v. Amer. Dist. Teleg. Co., supra*, 40 Cal.2d at p. 187.) Whatever that decades-old case has to say about whether an actual effort to estimate damages is *required*, it certainly does not say that the absence of such an effort is irrelevant.

agreement's non-defamation clause and incorporated the severance benefit figure into the agreement. The change-in-control agreement included neither a non-defamation clause nor a liquidated damages provision. There is nothing in these facts to support the notion that $1.3 million was a reasonable liquidated damages amount as a matter of law.

These circumstances are similar to those in *Greentree Financial Group, Inc. v. Execute Sports, Inc.* (2008) 163 Cal.App.4th 495. There, the defendant settled a contract dispute by agreeing to pay the plaintiff $20,000 in two installments, a discount from the original $45,000 contract claim. (*Id.* at p. 498.) The settlement agreement included a provision that if an installment was not paid, a stipulated judgment would be entered compelling full payment of the original $45,000, as well as "prejudgment interest, attorney fees, and costs." (*Id.* at p. 497.) The Fourth District Court of Appeal concluded that the provision was unenforceable because the amount bore no reasonable relationship to any range of damages that could actually be anticipated and the parties "did not attempt to anticipate the damages might flow from a breach." (*Id.* at p. 499.) Instead, they "simply selected the amount [the plaintiff] had claimed as damages in the underlying lawsuit, plus prejudgment interest, attorney fees, and costs," even though the record "contain[ed] nothing showing [the plaintiff's] chances of complete success on the merits of its case." (*Id.* at pp. 499–500.)

Micrel concedes that it did not fix the $1.3 million amount by estimating potential damages from a breach of the non-defamation clause, but it claims it should be excused from having done so because of the difficulty in predicting the damages that might arise from a former CEO's defamatory remarks. True enough, the difficulty of predicting damages is an appropriate factor to be considered when assessing the reasonableness of a

11

liquidated damages clause in a non-consumer contract. (See *El Centro*, *supra*, 174 Cal.App.4th at p. 63.) Though we accept that estimating damages from defamatory statements may be difficult, there was no evidence that Micrel even attempted to make such an estimate *at the time* it incorporated the amount of the severance benefits into the severance agreement.

The evidence also revealed that other, non-CEO executives employed by Micrel, Inc. had the same liquidated damages provisions in their severance agreements and that they were created in the same mechanical manner as was Zinn's, i.e., by incorporating compensation amounts from preexisting change-in-control agreements. This evidence provides additional support for the inference that the amount required to be remitted under Paragraph 20 was determined without contemplating potential damages arising from defamatory statements or the difficulty in predicting them. (See *El Centro*, *supra*, 174 Cal.App.4th at pp. 64–65 [liquidated damages provision applicable in both nationally recognized tenants' lease and leases for tenants allegedly lacking national stature gave rise to inference that provision was arbitrary rather than based on difficulty in estimating damages].)

Moreover, the trial court's ruling did not rest solely on its finding that Micrel failed to "actually engage[] in some form of analysis to determine what losses it would sustain from [a] breach and [did not make] a genuine and non-pretextual effort to estimate a fair average compensation for the losses to be sustained." (*Cellphone Termination*, *supra*, 193 Cal.App.4th at pp. 322–323.) The trial court also found that the $1.3 million amount did not bear a reasonable relationship to the damages that could have been anticipated to flow from a breach of the non-defamation provision—thus ruling against Micrel on the very factor it claims is determinative.

Micrel suggests that the $1.3 million figure had a rational relationship to future damages arising from defamatory statements because the amount "was very likely to *under*compensate Micrel, as the disparaging remarks of a former CEO about the current CEO might cause millions or even hundreds of millions of dollars in damage to Micrel." Micrel's expert opined at trial that defamation could have a significant impact on the company, with the amount of damages falling somewhere between five percent of Micrel's revenue—$12 million—or five percent of its stock value—$42 million. Sanghi also testified that the $1.3 million amount was reasonable because the potential damage could range from losing a few customers, a relatively small loss, to losing future opportunities to bid on acquisition targets, a loss of potentially hundreds of millions of dollars.

The trial court rejected this testimony, however, as it was free to do. (See *People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1568.) The court found that what matters in reviewing a liquidated damages amount are the "facts actually considered in evaluating the . . . amount. [The evaluation] cannot be based upon a post hoc rationalization." As a result, the court determined that the opinion of Micrel's expert "must be disregarded." And it rejected Sanghi's testimony on the damages issue because "[h]e made no analysis or effort to estimate a fair range of damages for [Zinn's] possible breach" but simply relied on his "intuition" that damages could be high. The court found that in all, "[t]here was a complete lack of any evidence . . . from which [it] could find that the amount of the liquidated damage figure bore a reasonable relationship to damages [Micrel] would be expected to actually suffer."

In short, the trial court did not err by concluding that Zinn sustained his burden of demonstrating that the liquidated damages provision was

13

unenforceable, based both on the evidence that Micrel made no reasonable endeavor to estimate potential damages stemming from Zinn's breach of the severance agreement and the lack of evidence that the approximately $1.3 million figure bore any reasonable relationship to those damages. Accordingly, the judgment must be affirmed.

>    B.    *The Trial Court Did Not Abuse Its Discretion in Reducing the Attorney Fees Award.*

Zinn contends that the trial court erred by reducing the amount of attorney fees he requested—$2,128,534.50—by about 16 percent, for a final award of $1,778,500. According to him, the reduction was not supported by the evidence. We are not persuaded.

The trial court found that Zinn was entitled to attorney fees under section 1717 because he was a prevailing party who had a reciprocal right to attorney fees under the severance agreement. (§ 1717, subd. (a).) Under that statute, "[r]easonable attorney's fees shall be fixed by the court." (§ 1717, subd. (a).) Courts have broad authority to determine the amount awarded, and " '[t]he "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court." ' " (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM*).) Accordingly, we review such rulings for an abuse of discretion. (*Ibid.*) Under this standard, reversal is generally warranted only " 'if the amount awarded is so large or small that it shocks the conscience.' " (*Calvo Fisher & Jacob LLP v. Lujan* (2015) 234 Cal.App.4th 608, 620.)

To determine the appropriate amount of fees to award, the trial court here calculated the "lodestar," which is done by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate. (See *PLCM*, *supra*, 22 Cal.4th at p. 1095.) The court also "considered the difficulty of the litigation, the amount of actual or potential money involved,

14

the skill and experience required of the attorney[,] and the results obtained." While the court found that Zinn's attorneys' billing rates were reasonable, it also found that the number of "hours billed in certain instances [was] greater than reasonable," and it reduced the total amount requested by $350,034.50.

Here, in finding that the number of hours billed was excessive, the trial court identified four specific examples: (1) paralegals billed a total of 10 hours or more in a single day "67 times" for pre-trial preparation between January 8 and January 18, 2019; (2) a paralegal billed 265 hours for time spent preparing "pretrial pleadings"; (3) about $142,000 was billed for work on the filing of sanctions motions and motions to compel discovery that were ultimately withdrawn or denied by the court; and (4) time was billed for work preparing Zinn's expert witness on issues that had already been resolved.

As Zinn points out, these examples of overbilling are not fully borne out by the record. For example, paralegals billed 10 or more hours for pre-trial preparation during the January 2019 period *six* times, not 67. It appears, however, that this was a simple typographical error. In addition, the actual billing entries show that the paralegal who billed 265 hours spent a significant amount of time on trial and posttrial activities, not just pretrial pleadings. But Zinn's own summary of the work she performed stated only that she "[a]ssisted with pretrial filings and briefs," even though the summary described other paralegals as having assisted with work at trial. We cannot fault the trial court for accepting Zinn's description of this paralegal's work.

Zinn further argues that two, not three, sanction motions and motions to compel were filed, with varying results. But given that the trial court already assessed and rejected the same arguments Zinn now makes on appeal, he fails to demonstrate that the court misunderstood the value of the

15

motions or the impact of its orders.  He also argues that the court must have wrongly assumed that any billing entry that mentioned the motions and other tasks was entirely for work on the motions.  But the entries do not distinguish the time spent on the motions and time spent on other tasks, making it difficult to identify the time attributable solely to the motion practice.  (See *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830 ["[B]lock billing is not objectionable 'per se,' though it certainly does increase the risk that the trial court, in a reasonable exercise of its discretion, will discount a fee request"].)

Even if we were to accept that the trial court mistakenly described some of its examples of overbilling, we are not persuaded that it abused its discretion in finding that the number of hours billed was excessive and in reducing by a relatively moderate sum the amount of requested fees.  A court is not "obligated to calculate exactly how many of the claimed hours the court believed were not compensable based on the various flaws the court found in the time entries, then subtract that sum from the total hours claimed to come up with the number of compensable hours." (*Mountjoy v. Bank of America, N.A.* (2016) 245 Cal.App.4th 266, 280.)  Rather, the general rule is that a "trial court has no sua sponte duty to make specific factual findings explaining its calculation of the fee award and the appellate courts will infer all findings exist to support the trial court's determination." (*California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 754–755.)

Zinn claims that even though the trial court was not required to detail its calculations, the reduction was arbitrary because there is no apparent relationship between the amounts billed for the four cited instances and the amount of the reduction.  He relies on authority to the effect that " '[w]hen a trial court makes an award that is inscrutable to the parties involved in the

16

case, and there is no apparent reasonable basis for the award in the record, the award itself is evidence that it resulted from an arbitrary determination. It is not the absence of an explanation by the trial court that calls the award . . . into question, but its inability to be explained.' " (*Roe v. Halbig* (2018) 29 Cal.App.5th 286, 312.) Zinn contends that having offered examples of overbilling, the court had to provide some "basis for understanding how its four findings resulted in the reduction amount of $350,034.50."

In fact, the $350,034.50 figure is very close to the total amount billed for the four examples of overbilling the trial court identified. According to Zinn's fees request, the paralegal who billed 265 hours did $97,598 of work. And in opposition to the fees request, Micrel submitted charts showing that (1) $142,068.50 was billed for the challenged discovery-related motions; and (2) $104,825 was billed for the challenged preparation of Zinn's expert witness. The sum of these three numbers is $344,491.50. In turn, the $5,543 difference between that sum and the total reduction is close to the amount of money the paralegals, who had billing rates between $370 and $400, billed for the hours exceeding 10 hours per day in the January 2019 period. Given that the court did not profess to itemize all instances of overbilling, we cannot say that its decision to reduce the award by what appears to be about the amount of the four identified instances constituted an abuse of discretion.

III.
DISPOSITION

The judgment and the order awarding attorney fees are affirmed. The parties shall bear their own costs on appeal.

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.



_____

Sanchez, J.


*Micrel, LLC v. Zinn*  A157136/A158069