Filed 6/25/25  P. v. Hartt CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>IRA SEAN HARTT,<br><br>  Defendant and Appellant. | D083245<br><br><br>(Super. Ct. No. JCF003868) |

APPEAL from a judgment of the Superior Court of Imperial County, William D. Quan, Judge.  Affirmed.

Paul Stubb, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Sahar Karimi, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Ira Sean Hartt guilty of inflicting injury upon Jane Doe, a person with whom he had a dating relationship (Pen. Code, § 273.5, subd. (a); count 1), and of the allegation he personally inflicted great bodily injury

during the commission of the offense (§ 12022.7(e)). He was sentenced to an aggregate prison term of 10 years. Hartt raises three issues on appeal.

First, Hartt claims his conviction of count 1 must be reversed because insufficient evidence was presented that he was in a dating relationship with Jane. We, however, conclude otherwise.

Second, Hartt argues the court erred in admitting "gruesome, cumulative, and unduly inflammatory" photographs of Jane's injuries. We disagree. The photographs are not cumulative, and their relevance significantly outweighed any potential prejudice to Hartt.

Finally, Hartt claims the prosecutor engaged in misconduct by failing to redact a transcript to reflect edits made in an audio recording. We conclude (1) Hartt forfeited this argument and (2) at any rate, Hartt fails to establish prejudice given the other evidence legitimately before the jury. Given this conclusion, we do not reach his claim of ineffective assistance of counsel.

Accordingly, we affirm the judgment.

I.

We focus on the facts relevant to the issues on appeal.

A.

According to Jane, in December 2020, she was living in Imperial County and cleaning up land she had inherited. People would come by to help, including Hartt, whom she met that October.

Jane considered Hartt her boyfriend, although she was dating someone else as well. Jane's other boyfriend was about her height, "heavyset," and bald. Jane said she and Hartt slept together when they dated, she "stayed at his trailer and everything" for a week, and she met Hartt's family as his girlfriend.

2

Jane's testimony was inconsistent about the timeline of her dating relationship with Hartt. She first said she and Hartt started dating and sleeping together "like a week" before the December 21 incident—discussed below—and were still dating at the time. She later clarified, "I never dated him before—it was just for a week, but not the week before the incident." Jane also said she and Hartt began dating several months before but it "only last[ed] one week" and admitted she told a police officer they started dating three months prior but broke up about a month before the incident.

On December 21, Jane and her helpers, including Hartt, spent the day cleaning her property. Everyone left, but Hartt came back with food when it was getting dark. Jane told Hartt she wanted him to leave, but Hartt wanted to have sex. When she said no, he got angry and began hitting her in front of her trailer. Jane fell to the ground and blocked her face with her arms, further infuriating Hartt. He stomped on Jane's head with his foot multiple times, called her a "bitch," and kicked her. She felt pain in her face, head, shoulder, and legs. Hartt stopped beating her when the police arrived.

Body-worn camera footage of Jane's interaction with a police officer was admitted and shown to the jury. In the video, Jane identified Hartt as the person who had beat her. When the officer inquired into their relationship, she said Hartt was her boyfriend.

B.

According to Hartt, he had known Jane "all [his] life." At trial, he claimed they were first cousins, but on cross-examination he clarified they were more distant relations. He denied ever having a sexual relationship with Jane.

Hartt claimed he and Jane reconnected in September 2020, when Jane hired him to help clear her property.

3

The morning of December 21, Hartt and his friend brought food from a food bank to Jane and her boyfriend at her trailer. Jane sold some of the food for a gallon each of vodka and orange juice, which Hartt, his friend, Jane, and her boyfriend drank over the course of the afternoon. Hartt left with his friend when it began to get dark, leaving Jane and her boyfriend alone.

Later, Hartt's wife asked him to go to the store for her. On his way there, his mother, who was driving by, stopped and picked him up. On the way home, Hartt asked his mother to drop him off at Jane's trailer, where he had left "a cellular phone battery."

As Hartt and his mother pulled up to the trailer, they heard a man and a female voice crying and saying, "'Stop hitting me.'" Hartt's mother left. Hartt walked to the open back door of the trailer, knocked on its side, and said, "'Imperial County Sheriff's Department.'" "It got quiet."

According to Hartt, Jane's boyfriend suddenly rushed out the door, jumped on Hartt, and began "beating [him] up." During their fight, Jane jumped out of the door onto Hartt's back. Hartt pushed the boyfriend, who "took off running." Jane pulled Hartt's ponytail and said he "better not say anything about that stolen vehicle." Hartt swung his fist backwards, punching her, and she fell off and hit the trailer.

Hartt then "walked off" and encountered the police.

C.

The night of December 21, Carl White and his wife were driving home from his aunt's house when they passed a trailer. Outside the trailer, he saw a "skinny" man with long hair worn loosely down "beating the shit out of" a prone person. The standing man was "mad" and "yelling," and he was "pounding, hitting, . . . kicking and punching" the other person. White did not see anyone else present.

4

White "told that man to get off the other person." The man said, "'Fuck you. Go get the cops. I'm not scared.'" White drove to the police station. No one was there, so his wife called 911. White then drove back to his aunt's house, where police officers took his statement.

White's uncle, meanwhile, walked to a spot across the street from the trailer. He saw a person hovering over someone on the ground who "wasn't even moving." White's uncle did not see anyone else. He heard the standing person say, in a male voice, "'You're lucky that I didn't kill you, Bitch.'" White's uncle returned to his house as the police arrived on scene.

When White was driving home later that night, he drove past the trailer and saw someone handcuffed outside it. That person was the same person he had seen beating the person on the ground.

### D.

The police called for an ambulance, which transported Jane to a hospital emergency room. At the hospital, the police photographed Jane's injuries. These photographs were admitted as evidence and shown to the jury. The hospital could not treat all Jane's injuries, so Jane was airlifted to a trauma center.

Jane got seven stitches around or in her mouth. Photographs taken at the trauma center five days after the beating showed the extensive bruising caused by Jane's injuries. These photographs, too, were admitted and shown to the jury. Jane's eye swelled shut, and it took a month and a half for the swelling to recede and for the pain in her face to go away. She was on bedrest for a month.

At the time of trial, Jane had lasting health impacts from the beating.

## E.

At trial, the prosecution admitted into evidence and played for the jury two jail calls involving Hartt.

In the first, just days after the beating, Hartt said Jane "fucking start[ed] talking shit" and "grabbed [him] by [his] hair," so he "upper-cutted the shit out of her."

In the second call, in May 2021, Hartt asked someone to "pick up [his] old clothes" and "[j]ust throw them away" because "[t]hey said that there was blood on my clothes." Hartt also told the other person his lawyer "wants to see [the old clothes], but nah."

The court directed the prosecution to redact the statement about Hartt's attorney from the audio recording and transcript. Although the statement was excluded from the audio recording, it remained in the transcript handed to the jury while the audio recording was playing. The transcript was not admitted into evidence, and the jury was instructed it was "not evidence." Defense counsel was given the opportunity to review the redactions to the transcript before the recording was played and did not object.

## F.

The amended information charged Hartt with a violation of section 273.5(a) and alleged he personally inflicted great bodily injury on Jane. The information further alleged Hartt had been convicted of a prior strike.

The jury convicted Hartt of the sole charged count and found him guilty of the great bodily injury allegation. In a separate bench trial, the court found true beyond a reasonable doubt the alleged prior strike.

6

The court sentenced Hartt to an aggregate term of 10 years in prison. It imposed the middle term of three years on count 1, doubled to six years given Hartt's prior strike that the court declined to strike. The court imposed a consecutive four-year term for the great bodily injury allegation.

## II.

We address each of Hartt's claims in turn.

## A.

First, Hartt claims his conviction of count 1 must be reversed because the record contains insufficient evidence he and Jane were in a dating relationship. We, however, agree with the People that the record contains substantial evidence of a dating relationship.

Under section 273.5(a), "[a] person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim described in" the statute "is guilty of a felony." One such victim is "someone with whom the offender has, or previously had, a[ ] . . . dating relationship." (§ 273.5(b)(3).) A dating relationship, as relevant here, "means frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations." (§ 243(f)(10).) This definition "does not require 'serious courtship,' an 'increasingly exclusive interest,' 'shared expectation of growth,' or that the relationship endures for a length of time." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1116.) Rather, "[t]he Legislature could reasonably conclude dating relationships, even when new, have unique emotional and privacy aspects that do not exist in other social or business relationships and those aspects may lead to domestic violence early in a relationship." (*Ibid.*)

We review a factfinder's conclusion that a dating relationship existed for substantial evidence. (*M.A. v. B.F.* (2024) 99 Cal.App.5th 559, 569.) In

7

doing so, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Such evidence can include not only circumstantial evidence, but also all reasonable inferences drawn from it. (*People v. Soriano* (2021) 65 Cal.App.5th 278, 286.)

The court of appeal has "no power . . . to weigh the evidence, [or] to consider the credibility of the witnesses." (*People v. Orange County Charitable Services* (1999) 73 Cal.App.4th 1054, 1072 [cleaned up].) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Even though she was also dating someone else, Jane testified she considered Hartt her boyfriend, they were sexually intimate, she spent a week at Hartt's trailer, and she met Hartt's family as his girlfriend. The body-worn camera footage from immediately after the beating depicts Jane referring to Hartt as her boyfriend. Contrary to Hartt's claim, Jane did not "testif[y] she never dated Hartt before the incident." (Italics omitted.) Instead, she clarified she did not date Hartt in the week preceding the incident. Although Jane's testimony about (1) the timing of her relationship with Hartt was internally inconsistent and (2) its existence was contradicted by Hartt's testimony, it is nonetheless substantial evidence. "'The mere fact that there are contradictions and inconsistencies in the testimony of a witness, or that the truth of [their] evidence is open to suspicion, does not render it inherently improbable'" and therefore insubstantial. (*People v. Tereno* (1962) 207 Cal.App.2d 246, 251.)

8

Also, the jury implicitly found Jane credible and Hartt not credible when it found Hartt guilty of the charged offense rather than the lesser included offense of simple battery, which required no evidence of a dating relationship.

Hartt contrasts the facts here with those of *People v. Upsher* (2007) 155 Cal.App.4th 1331, in which the court found substantial evidence of a dating relationship when the victim was in Upsher's house at 4:30 a.m., Upsher told an intervenor to mind his own business, Upsher and the victim were emotional, and Upsher used nicknames or terms of endearment at the scene and during his trial testimony. (*Id.* at pp. 1323-1324.) Specifically, Hartt makes much of his marriage to another, his lack of nicknames for Jane, and his failure to tell White to mind his own business. But Jane, like Hartt's mother, referred to Hartt by his middle rather than first name, which suggests a close relationship. And like in *Upsher*, Jane and Hartt were alone at one of their homes after dark and were emotional during the incident. We, like the People, see more parallels to *Upsher* than distinguishing facts.

In sum, we conclude the record contains sufficient evidence of a dating relationship to support Hartt's conviction under section 273.5(a).

B.

Second, Hartt contends the trial court abused its discretion in admitting photographs of Jane's injuries, taken both shortly after the incident and five days later, claiming they were cumulative, "gruesome," and unduly inflammatory. We conclude the trial court did not abuse its discretion in admitting the photographs.

"The admissibility of victim and crime scene photographs and videotapes is governed by the same rules of evidence used to determine the admissibility of evidence generally: Only relevant evidence is admissible."

9

(*People v. Lewis* (2001) 25 Cal.4th 610, 641.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has broad discretion in deciding the relevancy of evidence. (*Lewis*, at p. 641.) Even relevant evidence, however, may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) "The court's exercise of its discretion to admit assertedly gruesome or inflammatory evidence will not be disturbed on appeal unless the probative value of the evidence clearly is outweighed by its prejudicial effect." (*People v. Harrison* (2005) 35 Cal.4th 208, 233.)

Here, Hartt moved in limine to exclude photographs of Jane's injuries. The court found exhibits 1 and 2, showing Jane sitting in her hospital bed, to be "fair" as "one from a distance and one close up" and therefore not cumulative. It concluded exhibits 3 through 6 depicted different injuries— respectively, a bruise on Jane's left cheek, a bruise on her chin, a bruise on her wrist, and bruises on her legs. The court thus concluded the photographs were not cumulative and "the probative value for sure outweighs the prejudice." The court also allowed exhibits 7 through 9, which showed Jane's injuries several days later at the trauma center, as not cumulative, not gruesome, not irrelevant, and "not 352," noting the photographs showed "different parts of the body"— Jane's eyes, chin, and cheek, respectively.

The challenged photographs are relevant not only to corroborate Jane's testimony, but also to establish a traumatic condition for purposes of the charged offense as well as great bodily injury as required for the enhancement. Nor did the trial court abuse its discretion in concluding the

10

photographs were not gruesome, which Merriam-Webster defines as "inspiring horror or repulsion : GRISLY." (Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/gruesome> [as of June 25, 2025], archived at <https://perma.cc/S48K-7HT9>; see *People v. Panah* (2005) 35 Cal.4th 395, 476-477 [admitting autopsy and crime scene photographs of murder victim as trial exhibits despite being "disturbing"].)

While Hartt claims it "is simply not true" "the photographs were not cumulative because they were taken at different distances, different times, or even [of] different injuries," we disagree. All the photographs except exhibits 1 and 2 show different injuries or the same injuries but at a later point in time. As to exhibits 1 and 2, the zoomed-out photograph of Jane and the closer-up photograph of her face are not cumulative because the first photograph depicts the blood from Jane's injuries that covered her clothes, which the second photograph does not fully capture. The photographs at the trauma center show the full extent of Jane's injuries by revealing the bruising the initial photographs, due to their timing, could not. The photographs are thus not cumulative of each other.

While Hartt is correct Jane's injuries could have been established by her testimony alone and a single photograph, the Supreme Court has repeatedly rejected the claim that photographs of murder victims are excludable as cumulative because testimony also proved the facts the photographs were intended to establish. (*People v. Crittenden* (1994) 9 Cal.4th 83, 134-135 [collecting cases].) If such is the case in murder prosecutions, it is all the more true when the photographs are of nonfatal domestic violence injuries.

11

Because the challenged photographs' probative value is not clearly outweighed by any prejudicial effect they may have had on the jury, we conclude the trial court did not abuse its discretion in admitting them.

C.

Finally, Hartt argues it was prosecutorial misconduct or error for the prosecutor to have failed to redact from the transcript of the second jail call Hartt's statement that his counsel wanted to see his clothes from the night of the incident "but nah." Alternatively, he claims his counsel was constitutionally ineffective by failing "to simply check to ensure that the transcript was redacted" or "object[ing] in good faith after the transcript had gone to the jury." As we conclude any error was not prejudicial, Hartt's claims fail.

"A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.) The claim "is not preserved for appeal if [the] defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury." (*Ibid*.)

As the People contend, Hartt forfeited this claim by failing to object and seek an admonition below. Even were that not so, however, any error did not prejudice Hartt because it was not reasonably likely the jury would have come to a different result had the contested statement been redacted from the transcript.

The telephone call evidence the trial court admitted established Hartt was asking someone to get rid of the bloody clothes he was wearing the night of the crime. That he was further trying to hide that evidence from his attorney does not add much to the negative inferences drawable from the

12

properly admitted evidence.  At any rate, as the People note, the jury was instructed the transcript was not evidence, and we presume jurors follow the court's instructions.  (Citing *People v. Pearson* (2013) 56 Cal.4th 393, 414.)

Transcript aside, the evidence of Hartt's guilt was significant.  The evidence Hartt, rather than Jane's other boyfriend, inflicted Jane's brutal beating was overwhelming.  A witness saw a "skinny" man with long hair standing over Jane and beating her, thus ruling out Jane's "heavyset" and bald other boyfriend.  He later saw the same man in handcuffs, and it was Hartt who was taken into custody for the crime.  For the reasons provided above, there was substantial evidence Hartt and Jane were in a dating relationship.  And the photographs and Jane's testimony show her injuries due to the beating.  Given the evidence already before the jury, the passing statement in a transcript not admitted into evidence was unlikely to affect the trial's outcome.

Because Hartt failed to establish this error was prejudicial, we conclude Hartt is not entitled to relief for any prosecutorial misconduct.  Given this conclusion, we do not need to address Hartt's alternative claim of ineffective assistance of counsel.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

III.

We affirm.

CASTILLO, J.

WE CONCUR:

BUCHANAN, Acting P. J.

RUBIN, J.